Dimitrios **AVRAMIDIS**, et al.,
Plaintiffs, Appellants,

v.

**ARCO PETROLEUM PRODUCTS COMPANY, et al., Defendants, Appellees.**

No. 86–1110.

United States Court of Appeals,
First Circuit.

Argued June 2, 1986.

Decided Aug. 12, 1986.

---

Myles Jacobson, Boston, Mass., for appellants.

Richard Elliott Powers with whom Richard L. Neumeier, Gary D. Buseck and Parker, Coulter, Daley & White, Boston, Mass., were on brief, for appellees Atlantic Richfield Co. and ARCO Petroleum Products Co.

William G. Lowerre, Shell Oil Co. Legal Dept., Houston, Tex., for appellee Shell Oil Co.

Before COFFIN, Circuit Judge, BROWN,[*] Senior Circuit Judge, and BOWNES, Circuit Judge.

JOHN R. BROWN, Circuit Judge:

In this appeal, a group of gasoline station lessees challenges an order of the District Court lifting a preliminary injunction. The injunction had been entered pursuant to the authority of the Petroleum Marketing Practices Act in order to prevent the consummation of a sale of 29 Atlantic Richfield gasoline marketing franchises to the Shell Oil Company. The lessees claim that, by lifting the preliminary injunction, the District Court permitted their franchises to be terminated without the required 180-day statutory notice period. We disagree and affirm.

### Arco Pulls Up Stakes

This case involves the construction of various provisions of the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. §§ 2801–2806. The PMPA governs certain aspects of the relationships between gasoline marketers and their franchisees (hereafter referred to as dealers), including the termination of franchises.[1] Under § 2804(b)(2)(A), a franchisor[2] who elects to discontinue marketing gasoline in a given geographical market area must so notify any dealer in that area not less than 180 days before the effective termination date of the franchise. In addition, if the dealer is a lessee, the franchisor withdrawing from the geographical market must do one of two things: either it must make a bona fide offer to sell the franchisor's interest to the dealer, 15 U.S.C. § 2802(b)(2)(E)(iii)(I),[3]

---

[*] Of the Fifth Circuit, sitting by designation.

1. The PMPA allows franchises to be terminated for only five specified reasons, namely, (1) the franchisee's failure to comply with a material and reasonable provision of the franchise, (2) the franchisee's failure to exert good faith efforts to carry out the provisions of the franchise, (3) the occurrence of an event which is relevant to the franchise relationship and which makes termination reasonable, (4) an agreement to terminate between franchisee and franchisor, and (5) a good faith business decision by the franchisor to withdraw from retail marketing in a specific geographic area. 15 U.S.C. § 2802(b)(2)(A)-(E).

2. As defined by the PMPA, a franchisor is "a refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel." 15 U.S.C. § 2801(3).

3. 15 U.S.C. § 2802(b)(2)(E) provides as a valid reason for termination:

In the case of any franchise entered into prior to June 19, 1978, and in the case of any franchise entered into or renewed on or after such date (the term of which is 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which marketing premises are located, if—

(iii) in the case of leased marketing premises—

(I) the franchisor, during the 180-day period after notification was given pursuant to section 2804 of this title, either made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises, or, if applicable, offered the franchisee a right of first refusal of at least 45 days duration of an offer, made by another, to purchase such franchisor's interest in such premises; or

(II) in the case of the sale, transfer, or assignment to another person of the franchisor's interest in such premises in connection with the sale, transfer, or assignment to such other person of the franchisor's interest in one or more other marketing premises, if

or if the franchisor offers to sell two or more of its outlets to another franchisor, it must ensure that the proposed purchaser offers the dealer a "nondiscriminatory" franchise—i.e., a new franchise agreement on the same terms as offered to the purchaser's existing dealers, 15 U.S.C. § 2802-(b)(2)(E)(iii)(II).[4]

With that statutory backdrop in place, we come to the facts of this case. In the spring of 1985, Atlantic Richfield Company (Arco) decided to sell its marketing and refining assets located east of the Mississippi River. On May 21, 1985, Arco sent written notice to its various dealers in that area advising them that their franchise agreements with Arco would be terminated on November 30, 1985. Arco then sought a purchaser for its eastern assets.

On July 19, 1985, about two months after its written notice of termination, Arco entered into an agreement with Shell Oil Company (Shell) by which Shell would purchase from Arco approximately 400 Arco service stations located in the northeastern United States. Pursuant to the terms of this agreement, Shell agreed to offer to each Arco dealer a nondiscriminatory franchise, as required by the PMPA. In early September, Shell sent each Arco dealer a franchise agreement, a lease setting forth the rents that Shell would charge over a three-year period, and a notice concerning Shell's Variable Rent Program. The Variable Rent Program was a voluntary program under which a dealer could earn a reduction in contract rent based upon sales of Shell gasoline that exceeded a prescribed volume. The notice indicated that the Variable Rent Program would be made available to the dealers after six months, a time apparently required by Shell to determine a Shell gasoline "volume history," i.e., quota,

for each dealer. The Arco dealers were given a fixed period of time to execute the franchise agreement and lease, and all of the dealers involved in this litigation did so, although several signed the agreements reserving their right to pursue the instant action.

### Litigation Sets In

On October 22, 1985, 29 Arco dealers in the Boston, Massachusetts area brought this civil action against Arco and Shell. In their complaint, brought pursuant to 15 U.S.C. § 2805(a), the dealers alleged that (i) Arco did not make its determination to withdraw from the eastern market in good faith, (ii) Shell's offer to the Arco dealers discriminated against them in favor of existing Shell dealers, and (iii) the Arco dealers were entitled under the PMPA to purchase their stations from Arco. The dealers sought to enjoin Arco from terminating their franchises and to enjoin Shell from purchasing their franchises. The dealers also sought a declaration that each dealer had a right "to receive an offer to purchase Arco's interest in his respective marketing premises" pursuant to the PMPA.[5]

The dealers moved for a preliminary injunction under 15 U.S.C. § 2805(b)(2), which provides for a granting of a preliminary injunction when the dealer shows that its franchise is being terminated, and when "there exists sufficiently serious questions going to the merits to make such questions a fair ground for litigation...." *Id.* § 2805(b)(2)(A)(i), (ii).[6]

After a hearing the District Court issued the requested preliminary injunction on November 29, 1985, one day before the proposed terminations were scheduled to go into effect. The District Court first found that the dealers had not offered sufficient

---

such other person offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by such other person or franchises then in effect and with respect to which such other person is the franchisor.

4. *See* note 3 *supra.*

5. *See* 15 U.S.C. § 2802(b)(2)(E)(iii)(I) laid out in note 3 *supra.*

6. The District Court also must find that "the hardships imposed on the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted." 15 U.S.C. § 2805(b)(2)(B).

evidence to support their claim that Arco's decision to withdraw from the eastern market was not made in good faith. It also found, however, that Shell's failure to specify precisely the terms of its Variable Rent Program in its franchise offers brought into question the validity of those offers by making them "too indefinite and uncertain for enforcement." Although the dealers knew what their maximum monthly rent would be, they claimed not to know how to determine the potential reductions in rent available under the program. The District Court concluded that "without stated standards, Shell could apply the VRP in an arbitrary, or even discriminatory, manner based on plaintiffs' conformity to Shell's marketing plans."

The District Court did, however, expressly provide that its order was without prejudice to Shell and Arco seeking reconsideration based on a more precise definition of the terms of the Variable Rent Program. Moreover, the District Court denied the dealers' requested order directing Arco to offer the dealers an opportunity to purchase Arco's interest in their franchises. The District Court ruled that such relief would be permanent, not preliminary, and in any event, the PMPA did not require Arco to offer its dealers an opportunity to purchase their franchises.[7]

Shell subsequently submitted affidavits containing additional details about its Variable Rent Program and moved for reconsideration of the preliminary injunction. After a hearing the District Court found that

any defect in Shell's offers had been cured and that the modified offer was sufficiently definite to constitute a valid offer under the PMPA.[8] On February 11, 1986, the District Court dissolved the preliminary injunction, thereby allowing the franchise terminations to become effective, the sales of the service stations to close, and the dealers to become Shell franchisees. The dealers moved unsuccessfully for a stay pending appeal, both in the District Court and in this Court. On February 15, 1986, after these motions were denied, Shell and Arco closed the sales of the Arco franchises and Arco ceased selling gasoline to the dealers.

The dealers now appeal the District Court's decision to vacate the preliminary injunction.

*The Dealers Fight a Rearguard Action*

On appeal, the dealers do not challenge the District Court's finding that the details of Shell's Variable Rent Program became sufficiently explicated to transform Shell's formerly indefinite franchise agreements into valid offers. Rather, the dealers assert that by dissolving the preliminary injunction as soon as the offers became valid (and thus terminating the dealers' Arco franchises), the District Court allowed Arco to terminate their franchises without providing them with the requisite statutory 180–day notice period that is required before termination can take effect. In other words, the dealers by this appeal request that we order the District Court (1) to

---

7. *See* 15 U.S.C. § 2802(b)(2)(E) quoted in note 3 *supra.* Because Shell's purchase offer included some 400 Arco franchises, as well as numerous other assets, subsection (E)(iii)(II)—requiring only that the purchasing franchisor offer the dealer a nondiscriminatory franchise—applied, rather than subsection (E)(iii)(I) whose "right of first refusal" provision contemplates the sale of a single franchise.

8. The Variable Rent Program provides that the dealer may earn reductions in rent based upon sales of Shell gasoline exceeding a particular "threshold volume" established by Shell. For every gallon of gasoline above the threshold sold, the dealer receives a specified reduction in rent. In its initial proposal, Shell did not disclose to the dealers what their threshold vol-

umes would be nor how the threshold volumes would be calculated. It was concern over this lack of information that prompted the District Court to issue its preliminary injunction.

Shell maintained that its method of calculating threshold volumes was a trade secret, but pursuant to the District Court's protective order, the plaintiffs' counsel was allowed to examine the method to satisfy himself that the method was not applied in a discriminatory fashion. In addition, Shell disclosed what the dealers' threshold volumes would be for February, March, and April of 1986, and it indicated that these volumes would remain constant through April 1987 unless changed by Shell on the basis of objectively reasonable business considerations.

require Arco to give a new 180–day notice period prior to a new specified termination date, and (2) to require Shell to renew its franchise offers during that new notice period.

We begin our analysis with the standard of review. As we pointed out above, the PMPA directs the District Court to grant a preliminary injunction when "there exists sufficiently serious questions going to the merits to make such questions a fair ground for litigation...." 15 U.S.C. § 2805(b)(2)(A)(ii). In lifting the preliminary injunction, the District Court impliedly determined that the contentions remaining in the dealers' complaint (after the offer was found to be nondiscriminatory) were no longer sufficiently "serious questions going to the merits." We review that determination under an abuse of discretion standard. *Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981) (decision to grant or deny preliminary injunction is reviewable only for abuse of discretion).

The dealers' contention regarding their entitlement to a "new" 180–day notice period necessarily must be judged against the statutory provisions of the PMPA. Unless there is a "serious question going to the merits" that the dealers are entitled to what they seek, then the District Court did not abuse its discretion in lifting the preliminary injunction.[9] We therefore examine the relevant provisions of the PMPA.

Under the PMPA, a franchisor may terminate an unexpired franchise only if the two requirements contained in § 2802(b) are met: the franchisor must satisfy the minimum notice requirements prescribed in § 2804,[10] and the reason for the termination must fall within one of the five categories deemed bona fide grounds for termination by § 2802(b)(2).[11] In this case, the reason for Arco's termination of its eastern franchises is contained in the fifth of the five categories, "a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographical market area." 15 U.S.C. § 2802(b)(2)(E). The issue of the good faith of Arco's decision to withdraw from the eastern United States is not before us on appeal, so we limit our inquiry to the question of notice.

Section 2804 prescribes different notice periods depending on the circumstances of the termination. Section 2804(b)(2)(A) governs the notice requirements for terminations based on the franchisor's decision to withdraw from a relevant geographical market area. "In the case of any termination of any franchise ... pursuant to the provisions of section 2802(b)(2)(E) of this title [the geographical withdrawal section, *see* note 3 *supra*] ... the franchisor shall ... furnish notification to the franchisee not less than 180 days prior to the date on which such termination or nonrenewal takes effect...." *Id.* The notification must be in writing and it must contain "the date on which such termination or nonrenewal takes effect." 15 U.S.C. § 2804(c)(1), (c)(3)(B).

It is undisputed that Arco's May 21, 1985 notice was furnished to the dealers more than 180 days before the announced November 30, 1985 termination date. The dealers, however, assert that when the District Court's November 29th preliminary injunction eliminated the proposed November 30th terminations, the dealers became entitled to new written notification containing a new specific termination date set at least 180 days in the future. They assert that the District Court did not have the power to "cure" and thereby reinstate Shell's offers; instead it was required to reinitiate the entire 180–day notice and termination process. We disagree.

We first observe, as did the District Court, that 15 U.S.C. § 2804(b)(2)(A) pre-

---

**9.** Of course, if the District Court incorrectly interpreted the relevant statutory provisions, its decision is reviewable as an error of law.

**10.** Section 2804 specifies notice periods ranging from the "earliest ... reasonably practical" to 180 days depending on the event to be noticed.

**11.** *See* note 1 *supra*.

scribes a minimum notice period, but not a maximum. Although the franchisor must provide at least 180 days notice to a to-be-terminated dealer, nothing in the PMPA prevents the franchisor from providing more than 180 days notice. Thus, barring any other infirmities, Arco's May 21, 1985 notification—more than 190 days before the proposed November 30, 1985 termination date—provided more than sufficient notice of the franchise terminations. That these terminations actually occurred on February 11, 1986, the date the preliminary injunction was dissolved, instead of November 30, 1985, as originally proposed, does not violate the 180–day requirement.

The dealers argue, however, that the written notification is required to announce the date on which the franchise termination is to take effect. *See* 15 U.S.C. § 2804(c)(3)(B). They claim that, contrary to the statute, the lifting of the preliminary injunction effectively terminated their franchises without providing them with 180 days notice of the *specific* date on which their franchises would be terminated. They cite *Blankenship v. Atlantic Richfield Co.*, 478 F.Supp. 1016 (D.Oregon 1979), and *Thompson v. Kerr-McGee Refining Corp.*, 660 F.2d 1380 (10th Cir.1981), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 137 (1982), for the propositions that strict compliance with the notice requirements is necessary and that the courts are without authority to cure or waive notice defects.

We find the dealers' argument to be unpersuasive. The purpose of the PMPA's notice of termination requirements is to give the dealer sufficient advance warning of the impending termination so that he may make appropriate arrangements. *See Frankard v. Amoco Oil Co.*, 116 Wis.2d 254, 342 N.W.2d 247, 252 (Wis.App.1983) ("sufficient time to seek other distributors so that business will continue uninterrupted"); *Davis v. Gulf Oil Corp.*, 485 A.2d 160, 167 (D.C.App.1984) ("a reasonable period of time in which to make arrangements to dissolve or relocate their businesses"). In *Blankenship* and *Thompson*—the cases cited by the dealers as requiring

strict notice compliance—the courts were faced with franchisors who provided *less* than the minimum statutory notice and sought equitable relief from the letter of the PMPA. Under the facts before them, those courts properly refused to waive the statutory notice period. Here, in contrast, the dealers received more than the minimum statutory notice, but through their preliminary injunction, extended the effective termination date by several months. Because the dealers' own efforts transformed a definite termination date into a later unspecified date, they cannot now complain that they had insufficient notice of the terminations or that a new notification containing a specific new termination date is required. As the District Court observed, "only because of the Court's involvement is the notice arguably out of compliance with the statute."

The dealers also argue that the PMPA's statutory scheme implicitly supports their claim that a new 180–day notice period is required. Their argument runs as follows: the PMPA makes certain equitable relief available to a dealer who challenges a proposed termination only within 180 days of the notice of termination. 15 U.S.C. § 2805(b)(4)(B). Therefore, any nondiscriminatory offer made by the franchisor's successor (here, Shell) must be made within the 180 day period following the termination notice. Otherwise, the dealers argue, the successor could avoid mandatory injunctive relief by delaying its offer until after the 180 day period had passed.

The dealers' argument misses the mark. First, the PMPA does not require that the franchisor's successor make its nondiscriminatory offer within any particular time. *See* 15 U.S.C. § 2802(b)(2)(E)(iii)(II) quoted in note 3 *supra*. In contrast, the PMPA provides a specific timetable for those situations in which the franchisor offers to sell its franchise to the dealer or offers the dealer a right of first refusal. *See id.* § 2802(b)(2)(E)(iii)(I) quoted in note 3 *supra*. The fact that one subsection prescribes specific time periods and the adjacent subsection does not must reflect Con-

**18**

gress's wish not to restrict the bargaining flexibility of a franchisor wishing to sell a number of franchises. Second, the purpose of the 180–day notice period is to allow the dealer to make the necessary arrangements to address the termination of his franchise; it is not to allow him to mull over a successor franchisor's offer. The relief that the dealers seek is from termination and they had more than enough notice of that. Under the PMPA, they do not need another 180 days to decide whether to accept Shell's offers.

### Conclusion

In its initial granting of a preliminary injunction, the District Court, in its own words, "endeavored to get for the plaintiffs as much as the Court felt could properly be obtained for them within the letter and spirit of the [PMPA]." We find no statutory basis, however, for the dealers' claim that they are entitled to a new 180–day notice period. Thus, the District Court did not abuse its discretion in lifting the preliminary injunction, nor did it commit any error of law in its reading of the PMPA.

The dealers have waged a spirited fight and have managed to delay the inevitable for several months, but their arguments have finally run out of gas.

AFFIRMED.