**SOUTHERN NEVADA SHELL DEALERS ASSOCIATION, and Ronald Bird, Lyle Brennan, Donald David, David Goodwin, Harry Harvey, Al Razza, Don L. Valesquez, and Clifford Zimbelmann, individually, Plaintiffs,**

v.

**SHELL OIL COMPANY, a Delaware corporation; Atlantic Richfield Company, a Delaware corporation; Arco Petroleum Products Company, a division of Atlantic Richfield Company, Defendants.**

**No. S–85–910–RDF**

United States District Court, D. Nevada.

Sept. 11, 1989.

---

Kenneth P. Roberts, Woodland Hills, Cal., Norman Ty Hilbrecht, Las Vegas, Nev., for plaintiffs Goodwin and Zimbelmann.

William G. Lowerre, George A. Nachigall, Houston, Tex., Monte N. Stewart, Wright, Shinehouse & Stewart, Las Vegas, Nev., Timothy R. Cappolino, Shell Oil Legal Dept., Houston, Tex., for defendant Shell Oil Co.

Donald C. Smaltz, Leighton M. Anderson, Morgan, Lewis & Bockius, Los Angeles, Cal., Thomas F. Kummer, Vargas & Bartlett, Las Vegas, Nev., Paul J. Richmond, Los Angeles, Cal., for defendants Atlantic Richfield & Arco Petroleum.

## ORDER GRANTING ARCO'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART SHELL'S MOTION FOR SUMMARY JUDGMENT

ROGER D. FOLEY, Senior District Judge.

This matter is before the court on the defendants' Motions for Summary Judgment. For the following reasons, Atlantic Richfield Company's motion is granted and Shell Oil Company's motion is granted in part and denied in part.

### I. *Facts*

The two remaining plaintiffs [1] are former franchisees of Shell Oil Company (Shell) who operated retail service stations for Shell before Shell purportedly withdrew from the Las Vegas gasoline retail service market in February 1986.[2] Shell allegedly withdrew from the Las Vegas retail market by exchanging fifteen of its stations in Las Vegas, Nevada for twenty-three Atlantic Richfield Company (ARCO) stations in Chicago, Illinois. Three of the fifteen Shell stations transferred to Arco were operated by the remaining plaintiffs, David L. Goodwin (Goodwin) and Clifford Zimblemann (Zimblemann) (cumulatively, the dealers). Goodwin operated two stations, one at 3496 Las Vegas Blvd. South and one at 4916 South Paradise. Zimblemann operated one station located at 1625 South Decatur.

### II. *The Law of Summary Judgment*

Summary judgment is appropriate when the moving party presents evidence which shows that there is no genuine issue as to any material fact. FED.R.CIV.P. 56(c). The initial burden of presenting evidence

---

1. Of ten original plaintiffs only two, David L. Goodwin and Clifford Zimbelmann, remain in this action. The other plaintiffs dismissed their claims pursuant to a settlement agreement. *See* Order dated November 7, 1986 (Doc. #80); Order dated October 2, 1987 (Doc. #230); and Order dated November 8, 1988 (Doc. #363).

2. The plaintiffs initially filed this action seeking a temporary injunction against termination of their franchises before Shell withdrew from the market area. On December 30, 1985 this court denied that motion. *Southern Nev. Shell Dealers Ass'n v. Shell Oil Co.,* 634 F.Supp. 65 (D.Nev. 1985).

establishing the absence of a genuine issue of material fact is on the moving party. FED.R.CIV.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

If the court is satisfied that the moving party has met its burden, which is the same burden which would exist at trial on a motion for directed verdict, then the court may properly grant the motion unless the nonmovant presents evidence establishing a genuine issue for trial. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("[T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'") (emphasis in original). *Christy v. Hodel*, 857 F.2d 1324, 1328 (9th Cir.1988).

The nonmovant cannot rely solely on "averments of his pleadings" in order to prevent summary judgment. Advisory Committee Note to 1963 Amendment of FED.R.CIV.P. 56(e), 28 U.S.C.App., p. 626. Presentation of a scintilla of evidence by the nonmovant is also not sufficient to prevent summary judgment. Summary judgment should be granted if the pretrial evidence "is merely colorable" or "is not significantly probative." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. at 327, 106 S.Ct. at 2555 (*quoting* FED.R. CIV.P. 1).

**III. *ARCO's Motion for Summary Judgment***

The dealers originally alleged twelve claims against ARCO and Shell. Two claims against ARCO remain in the case and are the subject of ARCO's motion for summary judgment. Doc. #366. The dealers allege in the First Claim for Relief that ARCO did not act in "good faith" in offering franchise agreements to the franchisees because ARCO's intent was to terminate the franchises of the Shell franchisees, thereby violating section 102(b)(2)(E) of the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2802(b)(2)(E)(iii)(II). In the Tenth Claim for Relief, the dealers allege that ARCO is liable in tort for intentional interference with the contractual relations between Shell and Shell's franchisees in connection with Shell's termination of its franchise agreements.

 Pursuant to the requirements of the PMPA, a franchisor may sell or trade its franchise so long as the purchasing party "offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by such other person or franchises then in effect and with respect to which such other person is the franchisor." 15 U.S.C. § 2802(b)(2)(E)(iii)(II) (1982); *Avramidis v. Arco Petroleum Products Co.*, 798 F.2d 12, 13–13 (1st Cir.1986) (a purchasing franchisor must offer "a new franchise agreement on the same terms as offered to the purchaser's existing dealers....").[3]

---

**3.** ARCO footnotes a contention that the PMPA does not give a cause of action to a franchisee against a purchasing franchisor. *See Ewing v. Amoco Oil Co.*, 823 F.2d 1432, 1439 (10th Cir. 1987); *Boyers v. Texaco Refining and Marketing, Inc.*, (unpublished) No. 86–C–2915, 1988 WL 26851 (N.D.Ill. March 14, 1988), *aff'd on other grounds*, 848 F.2d 809 (7th Cir.1988). Neither case cited by ARCO discusses the rationale supporting its holding and this court does not believe such a constrictive reading of the PMPA is warranted.

Section 105 of the PMPA, 15 U.S.C. § 2805, creates a cause of action against a franchisor

"[i]f a franchisor fails to comply with the requirements of section 102 or 103 [15 U.S.C. §§ 2802 or 2803]." A "franchisor" is defined in section 101, 15 U.S.C. § 2801(3), as "a refiner or distributor ... who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel." The clear meaning of the definition of "franchisor" covers both the selling franchisor and the purchasing franchisor. This coupled with the imposition of a duty of good faith on a purchasing franchisor contained in section 102 suggests that section 105 creates a cause of action against both a

The issue in dispute is whether ARCO offered nondiscriminatory franchises to the Shell dealers in good faith. The dealers argue that ARCO's franchise offers were not made in good faith because (1) ARCO initially offered a one-year trial franchise before offering its usual three-year franchise; (2) internal memoranda and ARCO pricing policies indicate an intent to terminate the franchises of the Shell dealers; and (3) alleged violations of the PMPA by Shell adversely effect ARCO's good faith.

On or about August 27, 1985 ARCO offered Shell franchisees a one-year trial franchise. Thereafter, and before Shell actually terminated its franchises, ARCO constructively delivered offers for three-year franchises to each dealer. *See Southern Nev. Shell Dealers Ass'n v. Shell Oil Co.,* 634 F.Supp. 65, 70–71 (D.Nev.1985). Previously, this court held that the PMPA "does not place a limitation on the time in which a good faith nondiscriminatory offer must be made. Because there is no time limitation, this court must conclude that such offer can be made any time prior to the date the franchise is terminated." *Id.* at 70. Subsequent decisions of other courts have reached similar results. *Ewing v. Amoco Oil Co.,* 823 F.2d 1432, 1438 (10th Cir.1987) (noting ambiguity in section 2802(b)(2)(E)(iii)(II) as to whether a purchasing franchisor's franchise offer must be nondiscriminatory as compared to the initial franchise offer or as compared to a renewal franchise offer to existing franchises); *Avramidis v. Arco Petroleum Products Co.,* 798 F.2d 12, 15 (1st Cir.1986) (district court found that "any defect in Shell's [prior] offers had been cured and that the modified offer was sufficiently definite to constitute a valid offer under the PMPA"). Since ARCO's three-year franchise offers were presented to the dealers months be-

fore Shell terminated its franchise agreements, the PMPA was not violated.

The dealers next argue that as of 1981, ARCO had adopted a policy to terminate its relationship with all franchisees and convert franchised retail gasoline outlets to company operations. The dealers direct the court's attention to a document titled "Position Paper Concerning the Refining and Marketing of Gasoline" which analyzes the changing retail gasoline market from one consisting primarily of full service stations to one consisting of low cost, high volume independent-type stations. Doc. #369, Exh. A.

The thrust of the position paper is contained in the following paragraph:

The simple fact is only a portion (perhaps 50%) of today's [ARCO] dealers would be able to handle, or would want to work hard enough to handle the volume entailed in independent type operations. If ARCO dropped its price to the point where a dealer should be able to closely match the independents, many dealers would retain high pump prices and pocket the ARCO cuts. What is needed is the means to motivate the dealer to high-volume mode. The answer is twofold: (i) station rent, and (ii) a price that declines with volume. The volume discount pricing is already in place in the industry-wide rebate system that has arisen in the past year. The rent must be set at the level commensurate with the commercial value of the property which we call "economic rent."

Doc. #369, Exh. A at 3178.

Under ARCO's economic rent structure, the Shell dealers' station rent as ARCO dealers would have increased substantially.[4] The plaintiffs argue the rent increases are indicative of ARCO's desire to eliminate dealers and signifies a lack of good faith in offering ARCO franchises.

selling franchisor and a purchasing franchisor for breach of the duty of good faith.

4. The dealers argue that rent at one of Goodwin's stations would have increased "by as much as 425 percent". Doc. 369 at 8 and 12. ARCO corrects that estimate by noting that the actual rental increase at Goodwin's station

would have increased by 325% and, if the ARCO rental increases were compared with the planned Shell increases under Shell's franchise agreements, then the ARCO rent increase on Goodwin's station would have been 112% and approximately 92% on Zimblemann's station. Doc. #375 at 7 n. 7.

The PMPA, however, only requires that the franchise terms be similar, *i.e.*, not discriminatory, to other franchises currently in effect or currently being offered by the purchasing franchisor 15 U.S.C. § 2802(b)(2)(E)(iii)(II); *Jimenez v. B.P. Oil Co., Inc.*, 853 F.2d 268, 270 (4th Cir.1988); *Avramidis v. Arco Petroleum Products Co.*, 798 F.2d at 13–14.

■ The "good faith" requirement is concerned with whether a sham determination is being used to conceal selective discrimination against individual franchises. *See* S.Rep.No. 731, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Admin.News 873. The test provides protection from an arbitrary or a discriminatory franchise termination or nonrenewal, "yet avoid[s] judicial scrutiny of the business judgment itself." *Siecko v. Amerada Hess Corp.*, 569 F.Supp. 768, 772 (E.D.Pa.1983).

Rather than being indicative of any lack of good faith, ARCO's higher franchise rents represent its business decision to operate high volume, low priced retail outlets instead of the traditional full service station. As a business decision, ARCO can properly adopt its position and this court cannot properly second guess the prudence of that decision. See *Lippo v. Mobil Oil Co.*, 802 F.2d 975, 980 (7th Cir.1986) (the PMPA recognizes franchisors' rights to adopt and implement changes in marketing decisions on a uniform basis); *Meyer v. Amerada Hess Corp.*, 541 F.Supp. 321, 331–332 (D.N.J.1982) (summary judgment granted as to defendant's market value rent formula despite percentage increases in rent of over three hundred percent for some dealers).

As noted above, ARCO's franchise offers must have been made in good faith and be nondiscriminatory. As to the nondiscriminatory requirement, there is no dispute that ARCO's three-year franchise offers were the same as then existed between ARCO and its other franchisees. In addition, ARCO has produced an affidavit by its Regional Manager, Thomas R. Murphy, and an exemplar of the franchise agreement offered the plaintiffs demonstrating

that the proffered three-year franchises were those offered to all ARCO franchisees and were then in effect between itself and its other franchisees. Doc. #365 at ¶ 25 and Exh. I at 10.

The dealers' final argument, which deals with Shell's alleged violations of the PMPA, has no bearing on ARCO's alleged violations of the PMPA. Shell's actions will be discussed in the next section dealing with Shell's motion for summary judgment, not here in relation to ARCO's motion.

Thus, because the plaintiffs have produced no evidence to show that ARCO's proposed franchise agreements were discriminatory or not made in good faith, the court grants summary judgment for ARCO on the PMPA claim.

■ ARCO has also moved for summary judgment on plaintiffs' Tenth Claim for Relief, that of interference with Shell's franchise agreements. ARCO argues that since it complied with the PMPA, no business interference tort can exist. The plaintiffs, in failing to respond to ARCO's argument in their opposition paper, have implicitly conceded that a finding of compliance with the PMPA precludes liability under the Tenth Claim for Relief. Summary judgment is also warranted as to this claim. Therefore, ARCO's motion for summary judgment on the remaining claims against it is granted.

IV. *Shell's Motion For Summary Judgment*

Of the twelve claims originally filed, all but the Tenth Claim applied to Shell as well as ARCO. The court previously granted summary judgment as to claims Seven, Eight, and Nine. (Doc. #192). The Sixth Claim seeking declaratory judgment with respect to the dealers' rights under the PMPA as those rights existed before franchise termination date of February 14, 1986 is moot. The remaining claims can be grouped into three categories: (1) the Petroleum Marketing Practices Act claim; (2) antitrust claims; and (3) common law fraud claims.

## A. The Petroleum Marketing Practices Act Claim

The PMPA allows a franchisor to cancel existing franchise agreements so long as the franchisor complies with PMPA requirements. 15 U.S.C. § 2802(b)(2)(E)(iii)(II). The franchisor carries the "burden of going forward with evidence to establish as an affirmative defense" that the franchise cancellation was permitted under the PMPA. 15 U.S.C. § 2805(c). There are three requirements of the PMPA which the plaintiffs argue Shell violated.[5] Because the court finds a genuine issue of material fact, the motion for summary judgment as to the PMPA claim is denied.

The parties dispute whether Shell conducted a market withdrawal as contemplated by the PMPA.[6] Before terminating its three-year franchise agreements, Shell was required to "withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located...." 15 U.S.C. § 2802(b)(2)(E). *See also* S.REP. NO. 731, 95th Cong., 2d Sess. 15, 35, *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS, 873, 892–893.

Shell gave its franchisees notice that it was terminating all franchises as of February 14, 1986. Thereafter, all but one franchise was terminated. Although he received notice of termination, Freddy L. Funston, continued operating his Shell franchise for approximately two months after the February 14th deadline. Funston had a two-year lease with Shell which extended until January 17, 1987; thus, because it was for a term less than three years, it was not covered by the PMPA. Thus, Shell was prevented from terminating the lease.

The parties essentially disagree over the required timing of a market withdrawal. The plaintiffs argue a proper withdrawal under the PMPA requires termination of all franchises within the market area on a date certain. Under these facts, that date was February 14, 1986. Because Shell did not terminate Funston's franchise until April, Shell's withdrawal was improper. Not surprisingly, Shell argues no specific date of withdrawal is required and the totality of the circumstances proves a complete market withdrawal.

The statute does not determine what constitutes a proper withdrawal. Legislative history on this topic is also scarce.[7] Neither is there a case determining what constitutes a proper market withdrawal under the PMPA.

The overriding purpose of the PMPA, however, is to prevent unfair and discriminatory termination of franchisees by franchisors. *Russo v. Texaco, Inc.*, 630 F.Supp. 682 (E.D.N.Y.), *aff'd*, 808 F.2d 221 (2d Cir. 1986). Consistent with this purpose is the acknowledgment that the PMPA must be given a liberal construction. *Brach v. Amoco Oil Co.*, 677 F.2d 1213 (7th Cir. 1982).[8]

---

**5.** Actions which are not disputed include: (1) whether Shell's decision to withdraw from the Las Vegas market was made after each franchise had been entered into; (2) whether Shell's decision to withdraw from the Las Vegas market was based on facts occurring after each franchise had been entered into; (3) whether Shell's decision to terminate each franchise was for the purpose of turning the franchise into a company owned salary station; (4) whether Shell gave proper notice of franchise termination; and (5) whether each terminated franchise under the PMPA was for a term of at least three years.

As to the latter requirement, Shell has admitted a violation of the PMPA in terminating Goodwin's station located at 3496 Las Vegas Blvd. South. Doc. #390. Since PMPA liability need not be established at trial, Goodwin must only prove damages. Doc. #394.

**6.** The parties also dispute whether Shell's determination to withdraw was made in good faith and in the normal course of business. These issues need not be addressed here because the court finds as a matter of law that Shell conducted an improper withdrawal under the PMPA.

**7.** Legislative history deals only with withdrawal effects on rural areas, market trends constituting a good faith decision to withdraw, and the definition of a "relevant geographic area." S.REP. NO. 731, 95th Cong., 2d Sess. 15, 27–28, 32–35, *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS, 873, 886–893.

**8.** "An essential requirement of Federal legislation is that the grounds for termination and non-renewal provided in the legislation not be so broad as to deny franchisees meaningful pro-

Shell would have this court hold that in making a market withdrawal, termination of franchises may occur at different times. The court rejects opening this Pandora's box.

If the court were to accept Shell's argument, future courts would become mired in trying to establish a cut-off date beyond which continued operation of a retail outlet would violate the PMPA. Here, Shell supplied Funston's station with product for about two months after all stations were scheduled to be transferred to ARCO. If, as Shell argues, two months is insignificant, then is four months also insignificant? Is one year insignificant? Could Shell terminate all fifteen franchises at a rate of one franchise a month for fifteen months? No, the better position is to hold that under each hypothetical an improper market withdrawal occurred.[9]

Since Shell had the power to terminate all of its franchises on a certain date, it is not unfair to require Shell to do so. The terminated franchisees are best protected, and Congress' goal of protecting franchisees is best promoted, by requiring a selling franchisor to withdraw completely and totally from the "sale of motor fuel through retail outlets" at a specified time.[10]

## B. Antitrust Claims

The plaintiffs' Second, Third, Fourth, and Fifth Claims for Relief, the antitrust claims, were previously the topic of a motion for voluntary dismissal. Docs. #288 and #339. Shell's counsel states the dealers have informed him that they do not plan to proceed with these claims. Counsel for the plaintiffs acknowledged during oral argument on September 1, 1989 that he did not object to entry of summary judgment on these claims. Therefore, summary judgment on these claims is granted.

## C. Common Law Fraud Claims

The plaintiffs have alleged two distinct fraud claims. The Eleventh and Twelveth Claims for Relief allege fraud in the inducement to enter into the Shell lease agreements and fraud in concealing material facts after a partial disclosure of material fact had been made.

According to Goodwin and Zimblemann, each asked Dick Larsen (Larsen), a marketing representative for Shell, if Shell was going to withdraw from the Las Vegas market.[11] Each was assured by Larsen that Shell was not going to withdraw from the Las Vegas market. Doc. #372 at 14–15.

Shell identifies its markets by using a four-tier classification system: opportunity, maintain, transition, and redirect.[12] Between 1981 and 1984 Las Vegas was classified as a "maintain" market. In 1984 Las Vegas' classification was lowered to "transition," and further lowered to "redirect" in early 1985 just before Shell and ARCO entered into their trade agreement. The

tections from arbitrary or discriminatory terminations and non-renewals or to prevent fulfillment of the reasonable renewal expectations of franchisees." S.REP. NO. 731, 95th Cong., 2d Sess. 15, 18, *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS 873, 877.

9. Another important point to keep in mind is that Shell had the power to trade its stations to ARCO on February 14, 1986 or on January 17, 1987 when Funston's franchise agreement lapsed by its own terms. Alternatively, Shell could have bought out Funston's contract on a date mutually agreed upon by the parties. In fact, Shell did purchase Funston's franchise agreement in April, 1986.

10. The minimum measure of damages would be lost profits from the time the first franchisee was terminated to the time the last franchisee was terminated.

11. Those discussions occurred prior to execution of franchise agreements by Goodwin and Zimblemann. Zimblemann executed his three-year Shell "Dealer Agreement" and "Motor Fuel Station Lease" on June 7, 1984 for a term commencing on October 1, 1984 and continuing through September 30, 1987. Goodwin executed his three-year agreements pertaining to the station at 4916 South Paradise on November 29, 1984 for a term commencing on December 1, 1984 and continuing through November 30, 1987. Goodwin executed his seventeen-month agreement pertaining to the station at 3496 Las Vegas Blvd. S. on December 28, 1984. Doc. #365 at 2 ¶¶ 2–4.

12. A "redirect" classification means that Shell will seek some means of withdrawing from the market area. Doc. #365 at 3, ¶ 7.

dealers argue that had they been made aware of the lowered classification from "maintain" to "transition," they would not have executed the new lease agreements.[13] The plaintiffs further argue that Larsen's statement about Shell's lack of plans to withdraw from the Las Vegas market was a partial disclosure of material fact creating a duty to further disclose Shell's marketing classifications and that the Las Vegas market had deteriorated.

█ The plaintiffs have failed to present any evidence suggesting that Shell somehow defrauded the plaintiffs by inducing them to renew their franchise agreements knowing all along that it was going to trade stations with another motor fuel retail chain. All of the evidence presented suggests that Shell did not make the decision to rid itself of its Las Vegas properties until April, 1985 which was several months after the franchise agreements had been signed. Furthermore, the franchise agreements themselves gave Shell the power of termination "at its option." Doc. #367 at 15–16. It is therefore difficult to see how the franchisees were defrauded when their bargained-for agreement allowed Shell to trade franchises at any time and the actual decision to trade franchises with ARCO was not made until after the dealers renewed their franchise agreements. Thus, there can be no fraud in the inducement to contract and the Eleventh Claim for Relief fails.

█ Likewise, the plaintiffs' contention that Larsen's statement about Shell's intent to remain in the Las Vegas retail market constitutes a partial disclosure requiring a further disclosure of Shell's marketing classification system is invalid. The present case is very similar to *Cal. Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466 (9th Cir.1987).

In *Franciscan Ceramics*, officers of the ceramic company told dealers that Franciscan was "here to stay" and made other general assurances. *Id.* at 1471. Several months later and pursuant to a contingency plan to take effect if profits did not rise, the company closed its operations. The dealers sued arguing fraud by failing to notify them of the company's option plan to close. The Court of Appeals held that general statements of a desire to continue business did not constitute fraud because at the time the statements were made, Franciscan Ceramics intended to remain in business. In addition, the statements did not give rise to a fiduciary duty requiring company officers to disclose the contingent plan to cease operations. *Id.* at 1471–1472.

Similarly, this court finds uncontroverted evidence that at the time Larsen stated Shell's desire to maintain a presence in the Las Vegas area, Larsen spoke the truth. *See* Doc. #372, Exh. F (Shell's annual market plan premise letter dated April 11, 1985 which reclassified Las Vegas to a redirect market). Furthermore, Larsen's statements did not create a duty to disclose Shell's marketing categorizations then in existence. *See Cal. Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d at 1471–1472. Thus, the court finds that Shell had no duty to reveal internal decision-making processes which may or may not have led to a decision to withdraw from the Las Vegas market.[14]

## V. Conclusion

For the reasons stated above, ARCO's motion for summary judgment is GRANT-

---

13. The plaintiffs also argue that they should have been advised when Shell further lowered its classification of the Las Vegas market from "transition" to "redirect." The plaintiffs present no evidence indicating that the market classification was lowered before or during the period of time when the plaintiffs were renewing their franchise agreements. All evidence suggests that Shell did not change its classification until April of 1985. *See* Doc. #372, Exh. F; Doc. #365 at 3, ¶ 7. Even if required to do so, it was impossible for Shell to advise the plaintiffs of the classification change prior to their entering into new franchise agreements.

14. If there existed any evidence indicating that Shell had decided to withdraw from the Las Vegas market before the franchise agreements were entered into, and that Shell intentionally led the dealers to believe otherwise in order to better position itself for a franchise trade, then a genuine issue of material fact as to whether fraud occurred would exist. Unfortunately for the dealers' position, there is not a shred of evidence supporting this theory.

ED and Shell's motion for summary judgment is DENIED as to the First Claim for Relief based on alleged noncompliance with the Petroleum Marketing and Practices Act and GRANTED as to all other claims for relief.