177 F.3d 755
 99 Cal. Daily Op. Serv. 3616
 UNOCAL CORPORATION; Union Oil Company of California,
Plaintiffs-counter-claimants-Appellees,
v.
Ebrahim KAABIPOUR, dba, Sunnyvale Unocal & dba, Santa Clara
Unocal; Hassan Khaziri; Hossain Khaziri; Mohsen Khaziri;
Evergreen Union Services, Inc., dba Evergreen Unocal;
Fariborz Nickbakhsh-Tali, Aka, Nick; Ali Raghian, dba, Al's
Unocal; Thuy Gia Nguyen; Leavesley Rd. Union 76 Inc.;
Noah Tollison; Tom W. Barnum, Dba, Cuperrino Union; David
J. Joines, Dba, Unocal at North First and Brokaw; Ronald
Gene Diedrich; Dba, La Jolla Tire and Service Center; Mark
Horne; Vu Hadoung, dba, San Mateo Unocal; Tinoosh
Eftekharian, dba, Sunnyside Unocal,
Defendants-counter-claimants-Appellants.
v.
Tosco Corporation, Counter-defendant-Appellee.
Charles Simmons; Yosuf Homayun; Seung K. Choi; David
Avisrur; Mehran Mike Hariri; Meir Ben-david; Fred Pakzad;
A.H.B. Properties, Inc.; Manasseh Bareh; Omid Badakhsh;
Dalla, Inc.; Asghar Kholdi; Steven Tedesco; Akbar Akrami;
S.M.B. Corporation; Javad S. Taat; Sabour Andkhoy; Warm
Springs Unocal, Inc.; Basir Andkhoy; Lawrence E. Raether;
Ata Tajyar; Ali Majdi; Sagahoh, Inc.; Mansor Ghneeian;
Best Care Unocal Auto Center, Inc.; Calabasas Unocal, Inc.;
Sayed Hashemyar; George Benjamin; John Otte; Toros K.
Deurdulian: Kevork Kasbarian, Plaintiffs-Appellants,
v.
Unocal Corporation; Union Oil Company of California; 76
Products Company, Inc.; Tosco Corporation,
Defendants-Appellees.
Unocal Corporation; Union Oil Company of California,
Plaintiffs-Appellees,
v.
Robert Cassel, Defendant,
and
Mohsen Khaziri; Charles Simmons; Lawrence E. Raether;
Meir Ben-david; Sabour Andkhoy; Basir Andkhoy; Omid
Badakhsh; Akbar Akrami; Sayed Hashemyar; Ata Tajyar,
Steven Tedesco; Manasseh Bareh; David Avisrur; Mehran
Mike Hariri; Javad S. Taat; Farhad Pakzad; Ali Majdi;
Asghar Kholdi; Seung K. Choi; Mansoor Ghaneeian; Yosef
Homayun; S.M.B. Corporation; A.H.B. Properties, Inc.;
Sagahoh, Inc.; Warm Springs Unocal, Inc.; Dalla, Inc.;
Best Care Unocal Auto Center, Inc.; Calabasas Unocal, Inc.;
John Otte; George Benjamin, Defendants-Appellants.
Bassam D. Hindi; Behrouz Shirdel; Mohamad Shirdel;
Carpinteria Car Care, Inc.; Chi Tai; Daniel Lee O'Neal;
Daniel W. Lentz; Faye Fouad; Ray Fouad; Frank E. Jakel;
Gregory Mesna; Gwendolyn Mesna; Harry Perry; Hayk Bazik;
Hovick G. Sadeghi; Javad Haghi; John Otte; Mauro
Antenncei; Onnik Nick Mathevossian; Paul A. Hilles; Said
Saidati; Salim Javahieri; Tracy Finnel; Van Duong;
Bradley DeBoer; Emry Brothers Investments, a General
Partnership; Dennis Azzarello; Vahanek Kupelian; M & K
Enterprises, Inc., a California Corporation; Stephen Ng;
Country Club Union, Inc.; John Hifai; Patricia Hilles;
Saeid Sabour; Tommy Gendal, Plaintiffs-Appellants,
v.
Tosco Corporation; T Northwest Properties II, Inc.; Clover
Trust 1997-1, a Delaware Business Trust; Union
Oil Company of California, a California
corporation, Defendants-Appellees.
 Nos. 97-56324, 98-56216, 98-56631 and 98-56365.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 14, 1999.
Filed May 18, 1999.
 
 James R. Carroll and Richard L. Dooley, Law Offices of Carroll, Gilbert & Bachnor, Brea, California, for the defendants-counter-claimants-appellants in No. 97-56324.
 Joseph M. Alioto, Alioto Law Firm, Daniel R. Shulman, Shulman, Walcott & Shulman, Minneapolis, Minnesota, for the plaintiffs-appellants in No. 98-56216 and for the defendants-appellants in No. 98-56631.
 Kenneth P. Roberts, Kenneth, Roberts, APLC, Woodland Hills, California, for the plaintiffs-appellants in No. 98-56365.
 Kenneth L. Waggoner, John J. Wasilczyk and Earle Miller, Brobeck, Phleger & Harrison, Los Angeles, California, for plaintiffs-counter-defendants-appellees Unocal Corporation and Union Oil Company of California.
 Gregory N. Pimstone, Latham & Watkins, Los Angeles, California, for defendants-appellees Tosco Corporation.
 Appeals from the United States District Court for the Central District of California; Audrey B. Collins, District Judge, Presiding. D.C. No. CV-97-00161-ABC, D.C. No. CV-97-01759-ABC, D.C. No. CV-97-00161-ABC, D.C. No. CV-97-6388-ABC.
 Before: D.W. NELSON, FERNANDEZ, and FLETCHER, Circuit Judges.
 FERNANDEZ, Circuit Judge:
 
 
 1
 These cases arise out of the withdrawal of Union Oil Company from the retail marketing of motor fuel in the states of Alaska, Arizona, California, Hawaii, Nevada, Oregon and Washington. In so doing, Union Oil sold all of its marketing assets to Tosco Corporation. A number of former Union Oil franchisees objected to the sale on various grounds. The district court ruled against all of them and these appeals ensued.
 
 
 2
 One group, the Kaabipour Group,[1] asserts that the district court erred when it declared that the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801-06, preempts California law as far as this transaction is concerned. Another group, the Simmons Group,[2] asserts that the district court erred when it decided that Union Oil and Tosco properly adhered to the provisions of the PMPA regarding withdrawal from the market, despite the Simmons Group's claims that they violated the timing, new franchise offer, and transfer of premises provisions of the PMPA. See 15 U.S.C. § 2802(b)(2)(E).[3] A third group, the Raether Group,[4] asserts that the district court erred when it decided that Union Oil and Tosco properly adhered to the provisions of the PMPA regarding withdrawal from the market, despite the Raether Group's claims, which were the same as the Simmons Group's PMPA claims. The final group, the Hindi Group,[5] asserts that the district court erred when it decided that Union Oil and Tosco properly adhered to the PMPA regarding withdrawal from the market, despite the Hindi Group's claims that they violated the franchise termination and transfer provisions of the PMPA. See 15 U.S.C. § 2802(b)(2)(E). We affirm.
 
 BACKGROUND
 
 3
 Unocal Corporation had established its wholly owned subsidiary, Union Oil, to conduct its petroleum refining, transportation, and marketing business. In 1994, Union Oil established a business unit, the 76 Products Company, to manage its refining and marketing operations, including a chain of more than 1200 service stations in Alaska, Arizona, California, Hawaii, Nevada, Oregon, and Washington. Those were operated under the terms of PMPA franchise agreements with Union Oil as the franchisor.
 
 
 4
 For several years, Unocal gave consideration to various ways of restructuring the 76 Products operations, with the principal options being a spin-off of the entity, a joint venture arrangement, or a sale. Though early negotiations during this period fell through, Unocal continued to hear expressions of interest in acquiring the 76 Products business unit from several businesses, and in September 1996 began meeting with Tosco about the possibility that Tosco would purchase 76 Products. Nevertheless, other restructuring plans continued and in October of 1996, Unocal management decided that the assets and employees of the 76 Products business unit should be transferred into a separate subsidiary. That plan was never consummated, but when it was announced, Unocal noted that it would be evaluating different options which could establish 76 Products as a separate entity, including an IPO, a joint venture, or a sale. Any future plans depended on the ability of 76 Products to develop sufficient earnings and cash flow to stand alone.
 
 
 5
 Discussions with Tosco continued, and by late October, Tosco and Unocal were in active negotiations over 76 Products. Tosco offered to purchase the 76 Products business unit. The Union Oil board authorized a counter-offer on November 4, 1996, and a letter of intent calling for Union Oil to sell 76 Products to Tosco was signed by Tosco and Union Oil on November 17. Negotiation of specific agreements remained to be accomplished, and several conditions, including the approval of Union Oil's board, had to be met before the sale was formalized. On December 2, 1996, the Union Oil board conditionally approved the sale and purchase agreement and other agreements, and authorized Union Oil's management to enter into agreement with Tosco. The management committee of the Union Oil board authorized the signing of the sale and purchase agreement on December 13, 1996, and the sale then took place on December 14, 1996.
 
 
 6
 The assets sold included the premises of the "76" service stations, which were leased to the franchisees; Union Oil's interests in the franchise agreements with its dealers; the rights to the "76" and "Union 76" trademarks; and other assets, including refineries, pipelines, tankers, inventories, etc. The sale of 76 Products constituted a "market withdrawal" by Union Oil from the motor fuel market in Alaska, Arizona, California, Hawaii, Nevada, Oregon, and Washington. Union Oil was to terminate its franchises, but Tosco was also obliged to offer each Union Oil franchisee a nondiscriminatory, three-year Tosco franchise. Between December 23 and 26, 1996, Union Oil sent all of its franchisees a letter notifying them of the termination and nonrenewal of their franchises, effective June 30, 1997, and also notified the Governors of the affected states of its market withdrawal.
 
 
 7
 By April 15, 1997, Tosco offered franchises, which were to become effective July 1, 1997, to the Union Oil franchisees. The new franchise contracts offered by Tosco essentially mirrored the prior contracts between Union Oil and the franchisees. However, an addendum to the Franchise Agreements noted that "[f]or off-balance sheet financing purposes," fee title to some of the franchise premises would be held by Clover Trust, which would purchase the property by taking a loan secured by a deed of trust, take fee title to it, and then lease it to T Northwest Properties II, Inc. ("Northwest"), a wholly owned subsidiary of Tosco. The franchisee's lease from Tosco was said to be "SUBJECT TO AND SUBORDINATE TO the lease with Clover Trust and deed of trust," (capitalization in original). Tosco reserved the right to terminate a franchisee's lease upon any termination or expiration of the Clover Trust lease, and Clover Trust could terminate a franchisee's lease upon any termination of the Clover Trust lease. If the Clover Trust lease were to terminate before the Franchise Agreement terminated, the addendum stated that "Tosco will exercise its option (or first right) to purchase the real property and improvements from the Clover Trust," after which the franchisees would lease their premises lease directly from Tosco, "rather than indirectly through the underlying lease" with Northwest. The Addendum further stated:
 
 
 8
 if Tosco has determined to non-renew or terminate this Agreement, or any renewal thereof, pursuant to a provision of the Petroleum Marketing Practices Act (PMPA) which gives you the right to receive an offer to purchase the service station premises, you will receive from Tosco either a bona fide offer or a right of first refusal to purchase the marketing premises.
 
 
 9
 Clover Trust is a Special Purpose Entity created to facilitate a "synthetic leasing" arrangement used by Tosco to finance a portion of the purchase from Union Oil. Clover Trust received a loan from Sanwa Business Credit Corporation ("SBCC"), paid that money to Union Oil, took title to the properties in trust for SBCC, and then entered into a short-term lease with Tosco's subsidiary, Northwest. SBCC agrees that its role in the transaction was to facilitate the acquisitions for Tosco. Tosco has the option of acquiring the property via a fixed formula at the end of the lease. If it does not acquire the property at the end of the lease, 20 to 25 percent of the original loan will no longer be its obligation. That means that it must pay 75 to 80 percent of the loan's value even if it does not take title to the premises. Tosco intended that the transaction with Clover Trust be treated as a secured loan for tax purposes, that Tosco be entitled to all the benefits of ownership, and that "all payments of Termination Value and Fixed Rent ... be treated as payments of principal and interest, as the case may be." Tosco and Northwest assumed all of the operational and casualty risks for the properties and all responsibility for their management, and for practical purposes has the attributes of ownership. Tosco and Northwest have all responsibility to insure and maintain the properties, must keep them free of liens, and have the right to sublease to the franchisees. Tosco's option to purchase the properties is effectively at a definite price, so that it bears the risk of depreciation, receives the benefits of appreciation, and is responsible for compliance with environmental laws.
 
 
 10
 Once the transactions between Union Oil and Tosco were completed, including the renewal of the franchises, disputes commenced with a number of the California franchisees, many of whom asserted a desire to purchase the premises on which they were operating. Those ultimately led to these actions.
 
 
 11
 Unocal and Union Oil filed suit against the Kaabipour Group and, ultimately, the Raether Group, seeking a declaratory injunction that the withdrawal from the sale of motor fuels in California and the sale of all of the marketing assets to Tosco did not violate the PMPA. The Kaabipour Group counterclaimed for declaratory relief and injunctive relief under California Business & Professions Code § 20999.25(a), seeking a right of first refusal on the transfer of the station premises to Tosco by Union Oil. The Kaabipour Group moved for summary judgment on the counterclaim; the district court denied summary judgment and then dismissed the counterclaim, holding that § 20999.25(a) was in conflict with the PMPA and was thus preempted. The Kaabipour Group appealed. Litigation involving the Raether Group continued for several months more. Unocal, Union Oil and Tosco moved for summary judgment on March 20, 1998, and the district court granted their motion. The Raether Group then appealed.
 
 
 12
 The Simmons Group filed a separate complaint and sought an injunction, declaratory judgment, and constructive trust against Tosco, Union Oil and Unocal. It alleged, among other things, that Union Oil violated the PMPA by entering into and renewing franchise agreements after it had decided to withdraw from the market, and by selling the Kasbarian premises to Clover Trust and SBCC, non-franchisors, without first offering Kasbarian a sale or right of first refusal. It also alleged that Tosco violated the PMPA because it failed to offer nondiscriminatory franchises. The district court granted summary judgment against the Group and it appealed.
 
 
 13
 The Hindi Group also filed a separate complaint and sought an injunction, declaratory judgment, and constructive trust against Tosco, Union Oil and Unocal. It alleged that they violated the PMPA (and Cal. Bus. & Prof.Code § 20999.25(a)) by selling the premises to Clover Trust and SBCC, non-franchisors, without first offering a sale or right of first refusal to the franchisees. The district court granted summary judgment against the Group and it, too, appealed.
 
 JURISDICTION AND STANDARDS OF REVIEW
 
 14
 The district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291.
 
 
 15
 We review "a grant of summary judgment de novo and must determine whether the district court correctly applied the law and if, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact." Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir.1998). We also review "[t]he district court's order granting [a] motion to dismiss for failure to state a claim Under Fed.R.Civ.P. 12(b)(6)" de novo. Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1295 (9th Cir.1998).
 
 DISCUSSION
 
 16
 As we have already pointed out, the major issues in these matters revolve around the requirements of the PMPA. We will consider the PMPA congeries of issues in this opinion.
 
 
 17
 The PMPA was designed to offer additional protection to petroleum products franchisees because it was felt that the large oil company franchisors had excessive bargaining power and that "remedying the disparity in bargaining power between franchisors and franchisees" provided a need for the legislation. S.Rep. No. 95-731, at 18-19 (1978), reprinted in 1978 U.S.C.C.A.N. 873, 877. But that was not the only concern, for Congress also felt that what was "[n]eeded is a single, uniform set of rules governing the grounds for termination and non-renewal of motor fuel marketing franchises and the notice which franchisors must provide franchisees prior to termination of a franchise or non renewal of a franchise relationship." Id. Moreover, as Congress noted "[p]articularly important is that legislation dealing with this subject recognize the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences." Id.
 
 
 18
 The courts of appeals have recognized these competing interests. As we, and others, have said, the "overriding purpose of Title I of the PMPA is to protect the franchisee's reasonable expectation of continuing the franchise relationship." Ellis v. Mobil Oil, 969 F.2d 784, 788 (9th Cir.1992) (internal quotations and citation omitted); see also May-Som Gulf, Inc. v. Chevron U.S.A., Inc., 869 F.2d 917, 921 (6th Cir.1989). But that does not mean that courts have ignored the other purposes. "[I]n an age of increasing corporate competition, the major firms must retain the freedom to seek greater economic efficiency through corporate reorganizations, mergers and acquisitions." May-Som Gulf, 869 F.2d at 921. " 'In a rapidly changing economy fixed preservation of business relationships may spell financial death to the detriment of franchisees as well as franchisors.' " Id. at 922 (citation omitted).
 
 
 19
 In so stating, we do not mean to indicate that perusal of the words of the statute should be deferred while we dig about in legislative history and the like. However, arguments which depend on the notion that the PMPA is a one-way statute, which should single-mindedly be construed to favor franchisee positions, are rooted in sterile ground. That said, it is important to set forth the words of the statute itself, as relevant here, because those form the backdrop against which the PMPA issues before us must be scrutinized. The statute provides as follows:
 
 
 20
 [A] determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located [is a ground for termination of a franchise or non-renewal of a franchise relationship], if--
 
 
 21
 (i) such determination--
 
 
 22
 (I) was made after the date such franchise was entered into or renewed, and
 
 
 23
 (II) was based upon the occurrence of changes in relevant facts and circumstances after such date; ... and
 
 
 24
 (iii) in the case of leased marketing premises--...
 
 
 25
 (II) in the case of the sale, transfer, or assignment to another person of the franchisor's interest in such premises in connection with the sale, transfer, or assignment to such other person of the franchisor's interest in one or more other marketing premises, if such other person offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by such other person or franchises then in effect and with respect to which such other person is the franchisor.
 
 
 26
 15 U.S.C. § 2802(b)(2)(E). With that in hand, we will turn to the specific issues in this case.
 
 A. The Timing of The Withdrawal
 
 27
 The Simmons Group and the Raether Group claim that Union Oil violated the PMPA because it decided on withdrawal before franchises were renewed with group members and because relevant circumstances did not change after those franchises were renewed. See 15 U.S.C. § 2802(b)(2)(E)(i). We disagree.
 
 
 28
 In order to meet the terms of 15 U.S.C. § 2802(b)(2)(E)(i)(I), Union Oil's decision to withdraw from the market must have been made after the date that the franchisees' franchises were entered into or renewed. The latest franchise renewal was October 1, 1996. The district court ruled that the withdrawal determination had been made on December 2, 1996, when Unocal's board approved a resolution authorizing Union Oil to enter into an agreement with Tosco. We agree. Thus, Union Oil met the requirements of § 2802(b)(2)(E)(i)(I).
 
 
 29
 Generally, the approval of the franchisor's Board of Directors constitutes the legally effective date of a decision for PMPA purposes. See May-Som Gulf, 869 F.2d at 919, 927 (holding that date franchisor's Board of Directors conditionally accepted buyer's bid was date market withdrawal decision was made); Anderson v. Chevron Corp., 933 F.Supp. 52, 59 (D.D.C.1996) (holding that "the day when the Board of Directors of defendant Chevron [the outgoing franchisor] tentatively approved the proposed exchange of assets with Exxon [the incoming franchisor], and instructed [its officers] to negotiate [and] execute a final exchange agreement" was date of market withdrawal decision). As the district court noted, the logic of these cases is compelling. Weighing options is not the same as making a decision, and, absent evidence to the contrary, a corporation is not bound until its board acts. As the franchisees' own references to the evidence in the record indicate, years of considerations, negotiations, and false starts had preceded the eventual deal with Tosco, and this, contrary to the franchisees' reasoning, suggests that courts should be wary about finding a fixed determination to withdraw at any point prior to the board's authoritative decision. Because none of the franchises was entered into or renewed after the decision to withdraw was made, the PMPA was not violated in this respect.
 
 
 30
 By the same token, the relevant facts and circumstances clearly changed after October 1, 1996, because only after that was a sale to Tosco negotiated and an even semisolid decision to withdraw reached. Therefore, 15 U.S.C. § 2802(b)(2)(E)(i)(II) was not violated either. See May-Som Gulf, 869 F.2d at 926 ("the presence of a willing and acceptable buyer is a fundamental change in market conditions").
 
 
 31
 B. The Transfer of The Premises; The Synthetic Lease
 
 
 32
 The Simmons Group, the Raether Group and the Hindi Group all claim that Union Oil violated the PMPA because the premises of one or more members of their groups were not transferred to Tosco itself, but were transferred to the Clover Trust. See 15 U.S.C. § 2802(b)(2)(E)(iii)(II). The claim of the Raether Group can be rejected at once because none of its members held premises which were transferred to the Clover Trust. The other two groups are a different matter, and their claims must be resolved on the merits, but we are satisfied that the district court did not err.
 
 
 33
 When a franchisor terminates or nonrenews existing franchises or franchise relationships[6] as part of a market withdrawal, § 2802(b)(2)(E)(iii) provides that the franchisor can either (I) grant the franchisee a chance to match a bona fide offer to purchase the premises or (II) sell, assign, or transfer the franchisor's interest in the premises to another person who will offer a nondiscriminatory franchise to the franchisee. Subsection II requires that the old and new franchisors act in a manner consistent with "the overriding purpose of ... the PMPA ... to protect the franchisee's reasonable expectation of continuing the franchise relationship." See Ellis, 969 F.2d at 788. The franchisees argue that the terms of subsection II have not been met, nor can they be, because Clover Trust, the holder of title to the premises, is not a franchisor[7] capable of offering nondiscriminatory franchises to the former Union Oil franchisees. That argument is far too simplistic.
 
 
 34
 All agree that Clover Trust is not a franchisor, and cannot authorize anyone to use a trademark in connection with fuel sales. It has not even entered into any contractual relationship with the franchisees. That, however, does not mean that the requirements of subsection II have not been met, and that subsection I should have been applied. As Union Oil and Tosco point out, the synthetic lease arrangement involving Clover Trust should not be considered a violation of subsection II, because Clover Trust is part of a special purpose financing arrangement whereby Tosco, in effect, purchased the property, and Tosco was capable of offering nondiscriminatory franchises to the former Union Oil franchisees.
 
 
 35
 Nothing in either the logic and purposes of the PMPA, or specifically of subsection II, precludes a person to whom the franchisor's interest in the premises is transferred from financing the purchase and securing that financing with the premises themselves. It would be most peculiar if the PMPA did preclude financing arrangements. It is true that the terms of the PMPA are to be liberally construed to protect the franchisees. See Humboldt Oil Co., Inc. v. Exxon Co., 695 F.2d 386, 389 (9th Cir.1982). On the other hand, the use of secured financing can facilitate large transactions like the one at hand, without adding any untoward instability to franchise arrangements. In that regard, as we have already noted, in enacting the PMPA Congress did not wish to unduly interfere with the interests of the franchisor, who is, after all, the owner of the property involved. See May-Som Gulf, 869 F.2d at 921; Valentine v. Mobil Oil Corp., 789 F.2d 1388, 1391-92 (9th Cir.1986). Union Oil had an interest in capitalizing on the investments it had made in the corporate identity and goodwill of 76 Products, and it could fully recover that investment if it could sell a going concern, including trademarks, franchise operations, and service station premises. If, as appears here, the particular details of the financing of the sale transaction had no untoward impact on the interests of the franchisees, there is no reason to find a PMPA violation.
 
 
 36
 The PMPA does not contain any internal definition of ownership, although it is rather expansive in its definition of "leased marketing premises," which it defines as premises "owned, leased, or in any way controlled by the franchisor." 15 U.S.C. § 2801(9); see also Fresher v. Shell Oil Co., 846 F.2d 45, 46-47 (9th Cir.1988). Tosco's control of the premises was always quite real. Indeed, general law treats synthetic lease arrangements as transparent for tax and other purposes.[8] The entire point of a synthetic lease is that it is treated as an operating lease for accounting purposes, but is otherwise regarded by virtually all concerned, including the government, as a secured loan.
 
 
 37
 Despite the fact that a synthetic lease arrangement could formalistically be parsed into individual arrangements which would include a purchase by Clover Trust for the benefit of SBCC with a lease to Tosco, we need not, and do not, ignore the fact that the cumulative arrangements resulted in a single transaction whereby Tosco took over the ownership role formerly held by Union Oil. See Sun Oil Co. v. C.I.R., 562 F.2d 258, 268-69 (3d Cir.1977). In other words, there is no reason to hold that an arrangement which is seen as a transparent financing arrangement with true ownership in a Tosco entity for other legal purposes should become opaque when we look at it through a PMPA lens.
 
 
 38
 In addition, to allay any franchisee concerns, Tosco included in the Addendum to the franchise agreement a statement that it will purchase the property from Clover Trust if the lease ends before the termination of the franchise agreement. The Addendum also guarantees the franchisees a right of first refusal pursuant to the terms of the PMPA in case of non-renewal or termination. Thus, Tosco is contractually bound in its franchise agreement to protect the franchisees' expectations of an ongoing franchise relationship. That, again, underscores Tosco's understanding that in reality its obligations and rights are the same as they would be under a more conventional mortgage. Tosco could breach its contract, default, and lose the property. But the PMPA does not require us to assume that it will, and it is more reasonable to assume, instead, that "[t]hings happen according to the ordinary course of nature and the ordinary habits of life." Cal. Civ.Code § 3546. Barring financial collapse, it is highly unlikely that Tosco will forego its option to purchase at the end of the synthetic lease term because the effective financial penalties would be very steep. From Tosco's standpoint, its acquisition of fee title is, as it puts it, "a forgone conclusion."
 
 
 39
 Moreover, the franchisees have not shown any interests put at risk by the method used to sell the premises to Tosco. They are operating under the same franchise terms, and their reasonable expectations of a continuing franchise relationship have not been thwarted by the use of the synthetic lease. The franchisees are all exactly where they reasonably could have expected to be under the franchise agreements they made as retailers of 76 Products had a more conventional financing arrangement been used. Life goes on as before, and they are receiving precisely the benefit of the franchise relationship that they bargained for.
 
 
 40
 The synthetic lease should, therefore, be treated as the financing vehicle it is, and for PMPA purposes Tosco should be looked upon as the transferee. Subsection II was not violated by its use.
 
 C. The Franchise Offers
 
 41
 The Simmons Group and the Raether Group claim that Union Oil violated the PMPA because Tosco did not make a nondiscriminatory offer of new franchises to them. See 15 U.S.C. § 2802(b)(2)(E)(iii)(II). Again, we disagree.
 
 
 42
 Section 2802(b)(2)(E)(iii)(II) allows a franchisor making a market withdrawal to sell, assign, or transfer the premises and the franchise to another franchisor who will offer a nondiscriminatory franchise to the franchisee. Again, subsection II requires the old and new franchisors to act in a manner consistent with "the overriding purpose of ... the PMPA ... to protect the franchisee's reasonable expectation of continuing the franchise relationship." See Ellis, 969 F.2d at 788.
 
 
 43
 Pursuant to the requirements of the PMPA, a franchisor may sell its franchise to another franchisor so long as the purchasing party "offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by such other person or franchises then in effect and with respect to which such other person is the franchisor." § 2802(b)(2)(E)(iii)(II). The terms of a franchisee's new franchise agreement need not be identical to those of every other franchise agreement; "[a] franchisor must be free to offer different terms at different franchise locations." Ewing v. Amoco Oil Co., 823 F.2d 1432, 1438 (10th Cir.1987). "The PMPA ... only requires that the franchise terms be similar, i.e., not discriminatory, to other franchises currently in effect or currently being offered by the purchasing franchisor." Southern Nevada Shell Dealers Ass'n v. Shell Oil Co., 725 F.Supp. 1104, 1109 (D.Nev.1989); see also Avramidis v. Arco Petroleum Prods. Co., 798 F.2d 12, 13-14 (1st Cir.1986).
 
 
 44
 The "good faith" requirement looks to whether the franchisor's actions are designed to "conceal selective discrimination against individual franchises," Southern Nevada Shell Dealers, 725 F.Supp. at 1109, but "avoid[s] judicial scrutiny of the business judgment itself." Id., citing Siecko v. Amerada Hess Corp., 569 F.Supp. 768, 772 (E.D.Pa.1983). In the context of grounds for nonrenewal under § 2802(b)(3)(A) of the PMPA, courts have similarly sought to inquire into "good faith" without engaging in "judicial second-guessing of 'the economic impact of an otherwise legitimate business decision by the franchisor. So long as the franchisor does not have a discriminatory motive or use the altered terms as a pretext to avoid renewal, the franchisor has met the burden required by the PMPA for determining good faith.' " Valentine, 789 F.2d at 1392 (citation omitted).
 
 
 45
 Neither Group disputes that the franchise agreements offered by Tosco were essentially the same for each of their members, or that they mirrored those which the franchisees had with Union Oil. They claim, however, that the PMPA requires that the franchises Tosco offered to the former Union Oil franchisees be compared to the "franchises ... in effect and with respect to which [Tosco] is the franchisor," which means, they argue, that the new "76" franchise agreements must be compared to Tosco's existing franchise agreements. Specifically these California franchisees seek to be compared with Tosco's BP franchisees, all of whom are outside of California. The district court did not resolve the comparison issue, but concluded that, even if the "76" franchise agreements were compared to the BP agreements, the differences between them would not amount to discrimination against the "76" franchisees. We agree with that approach and limit our consideration accordingly.
 
 
 46
 The sole salient difference between the franchise agreements that the franchisees address in this appeal is the provision for a yearly increase in rent in the "76" agreements, while the BP agreements have a fixed rent throughout the lease term. The franchisees offer no evidence of discriminatory motive in this difference, pointing only to the fact that Tosco reviewed its BP franchise agreements when deciding what agreements to offer its new "76" franchisees. They portentously observe that this means the different rent provisions cannot be dismissed as a mistake or accident, and assert that "[t]his is compelling evidence of bad faith." Of course, the mere fact that a decision was intentional does not evidence bad faith. All the more so here, where what Tosco decided to do was offer its new franchisees precisely the agreement terms they were accustomed to, rather than alter them. Indeed, it is hard to see how use of the "76" franchise terms, which the franchisees had been living with for years, became evidence of bad faith when offered by Tosco, the new owner of 76 Products. The mere fact that the amount of rent might differ from one place to another does not show discrimination. See Southern Nevada Shell Dealers, 725 F.Supp. at 1109. Especially is that true where, as here, the complaining group members are all located in California, whereas the agreements to which they wish to be compared refer to franchisees in other states, who were accustomed to a different leasing regime.
 
 
 47
 Because the franchisees have not demonstrated any lack of good faith in Tosco's offer of franchises to them, and cannot show that they have been treated in a discriminatory fashion, the district court did not err.
 
 D. Preemption of California Law
 
 48
 The Kaabipour Group asserts that California law applies to this market withdrawal and, as a result, Union Oil was required to offer its members the right to purchase their premises before they were transferred to Tosco. See Cal. Bus. & Prof.Code § 20999.25(a).[9] In a related claim, the Hindi Group asserts that because its members' franchises did not terminate at the exact time that the transfer to Tosco became effective, California law applies. The district court held that California law was preempted to the extent that it attempted to add terms and conditions to the market withdrawal by Union Oil beyond those required by the PMPA itself. We agree with the result reached by district court.
 
 
 49
 "In enacting the PMPA, Congress attempted to provide national uniformity of petroleum franchise termination law." Atlantic Richfield Co. v. Herbert (In re Herbert), 806 F.2d 889, 892 (9th Cir.1986). That uniformity "would be frustrated" if the PMPA did not preempt "all inconsistent state law." Id. Section 2806(a) of Title 15 provides for preemption of all state law with respect to termination of a petroleum franchise which is inconsistent with the PMPA.
 
 
 50
 The preemptive scope of the PMPA is limited; it does not reach any state laws which only incidentally affect franchise termination or nonrenewal. See Pride v. Exxon Corp., 911 F.2d 251, 257-58 (9th Cir.1990) (finding that state law regarding fraud in the formation of contracts was not preempted by the PMPA because it did "not implicate the grounds for, procedures for or notification requirements of termination and nonrenewal under the [PMPA]"); see also Esso Standard Oil Co. v. Dept. of Consumer Affairs, 793 F.2d 431, 434 (1st Cir.1986) (restrictive view of PMPA preemption); Bellmore v. Mobil Oil Corp., 783 F.2d 300, 304 (2d Cir.1986) (same); O'Shea v. Amoco Oil Co., 886 F.2d 584, 592-93 (3d Cir.1989) (same); Consumers Petroleum Co. v. Texaco, Inc., 804 F.2d 907, 915 (6th Cir.1986) (same). But see Jimenez, 853 F.2d at 272-74 (expansive view of PMPA preemption, rejecting Bellmore ); Continental Enters., Inc. v. American Oil Co., 808 F.2d 24, 27-28 (8th Cir.1986) (same, rejecting Esso Standard Oil Co.). See also Theresa L. Kruk, Annotation, Pre-emptive Scope of § 106(a) of Petroleum Marketing Practices Act (15 U.S.C.A. § 2806(a)), 103 ALR Fed. 698, 704-05 (1991). On its face, however, that offers little succor to these groups because this clearly was a market withdrawal by Union Oil and a termination of the franchises.
 
 
 51
 California Business & Professions Code § 20999.25(a) "was prompted by a concern that major oil companies were reducing the number of independently-operated service stations in California." Forty-Niner Truck Plaza, Inc. v. Union Oil Co., 58 Cal.App.4th 1261, 1272, 68 Cal.Rptr.2d 532, 537 (1997). It parallels the PMPA in "seek[ing] to protect the franchisee's reasonable expectation of continuing its business while allowing the franchisor adequate flexibility to respond to changing market conditions." Id. at 1273, 68 Cal.Rptr.2d at 538.
 
 
 52
 While § 20999.25 parallels the PMPA, it does not invade the PMPA sphere. In Forty-Niner, the court said, "[T]he PMPA covers franchise termination and nonrenewal while section 20999.25(a)'s scope encompasses a situation where the franchisor is going to sell the service station premises but will assign rather than end the franchise arrangement." Id. at 1276-77, 68 Cal.Rptr.2d at 540. It noted that "[t]he sponsor of [section 20999.25(a) ], ... states that the bill is intended to address circumstances not covered under the [PMPA]." Id. at 1275, 68 Cal.Rptr.2d at 539 (internal quotation marks and citations omitted). It concluded that "[s]ection 20999.25(a) is not designed to cover franchise termination or nonrenewal in a way different than the PMPA," and "must be construed to be the same as the PMPA with respect to franchise termination or nonrenewal." Id. and n. 6.
 
 
 53
 The franchisor in Forty-Niner, which was also Union Oil, had sold truck stop properties it had leased to franchisees to a third party, but had assigned the franchise agreements to that third party rather than terminate or nonrenew them. Because there was no termination or nonrenewal, the PMPA was not implicated. The court concluded that "[t]he PMPA and section 20999.25(a) occupy different spheres." Id. at 1276, 68 Cal.Rptr.2d at 539-40. "[S]ection 20999.25(a) facilitates the purchase of the service station by the franchisee leasing and operating it (outside the PMPA context of termination or nonrenewal )."[10] Id. at 1274, 68 Cal.Rptr.2d at 538 (emphasis added). Thus, it fills gaps not covered by the PMPA. See, e.g., Patel v. Sun Co., Inc., 866 F.Supp. 871, 873 (E.D.Pa.1994) (where franchise rights were not sold, assigned, or otherwise affected, despite sale of premises, the franchisees' requests for injunctive relief and damages under the PMPA were denied, because the PMPA is not addressed to situations not involving termination or nonrenewal), aff'd on other grounds, 63 F.3d 248 (3d Cir.1995). In other words, the statutes are not really in conflict, and the PMPA controls in a termination or nonrenewal case.
 
 
 54
 We much prefer that reading of the statutes. It accords with the respectful approach of generally interpreting and applying legislation by harmonizing state and federal statutes where possible so as to avoid finding preemption. See California ARCO Distribs., Inc. v. Atlantic Richfield Co., 158 Cal.App.3d 349, 359, 204 Cal.Rptr. 743, 750 (1984) ("State and federal laws should be accommodated and harmonized where possible so that preemption can be avoided."); see also Committee of Dental Amalgam Mfrs. and Distribs. v. Stratton, 92 F.3d 807, 811 (9th Cir.1996) (strong presumption against finding that state law is preempted by federal law).[11]
 
 
 55
 In this case, Union Oil was expressly engineering a market withdrawal involving the termination of franchise agreements, and was selling its franchise business and the premises. Thus, because the federal and state provisions "occupy different spheres," Forty-Niner, 58 Cal.App.4th at 1276, 68 Cal.Rptr.2d at 539-40, and this case is within the context of franchise termination or nonrenewal, the federal provision controls.
 
 
 56
 The Hindi Group attempts to avoid this result by asserting that California law applies because this really was not a nonrenewal or termination situation. Considering the fact that Union Oil did give notice of both nonrenewal and termination, together with the fact that Tosco did offer a new franchise agreement, that is a rather surprising argument. Like other group arguments in this case, it is based on a transaction technicality.
 
 
 57
 Union Oil notified the franchisees on December 26, 1996, that their franchises would be nonrenewed or terminated effective June 30, 1997. In the meantime, the sale to Tosco closed March 31, 1997, and Tosco offered new franchise agreements, which were to be effective July 1, 1997. During the period from March 1, 1997 to July 1, 1997, the franchisees were operating under their old franchise agreements. Thus, the Hindi Group argues, there was no PMPA termination at all.
 
 
 58
 The argument is not without a degree of elegance, but it is a grasp at a straw. The PMPA does not state that in a complex transfer situation everything must happen on one day. It merely provides that a franchisor may terminate or fail to renew a franchise, if it is withdrawing from the market, transfers the premises to a new franchisor, and the new franchisor makes a proper offer of a new franchise. See 15 U.S.C. § 2802(b)(2)(E)(iii)(II). That is precisely what occurred here.
 
 
 59
 As Tosco points out, it had to own the property before it could offer new franchises at those sites, which would not be subject to contingencies inherent in closing the sale. The approach used also gave the franchisees enough time to consider the new franchise agreements. Nothing argued by the franchisees suggests any defect in those considerations. Moreover, Tosco asserts, "[t]his timing mechanism is a procedure generally utilized in market withdrawals where a new franchise will be offered to the franchisees by the purchasing franchisor." That assertion appears plausible, and is not refuted by the franchisees. We accept it.
 
 
 60
 The PMPA neither states nor implies that a complex transaction should be evaluated by parsing it moment by moment into each discrete component, rather than considering it as a single transaction. To so parse it would be particularly undesirable where, as here, the arrangement is consistent with the PMPA's purpose of stabilizing continuing franchise relationships, rather than causing discontinuities in the motor fuel marketing area. The Hindi Group's argument implies that if land is transferred a day before the franchise ends, state law applies, and if it transfers the day after the franchise ends, the PMPA is violated. Neither of those implications holds water. Rather, Union Oil and Tosco did comply with both the letter and the spirit of the PMPA when the former chose to withdraw from the market. The straw will not keep this claim afloat.
 
 CONCLUSION
 
 61
 The various groups of franchisees who have appealed these cases seem to look upon the PMPA as if it were merely a rigid mathematical formula, which must be followed with precision if the correct answer is to be obtained. It is not. In fact, in enacting the PMPA Congress used language which is quite fluid. While the substance of the provisions must be followed, no particular set of facts constitutes the sole means of meeting those substantive requirements. Recognizing that, we hold that the substance of the requirement that the franchisor's interest in the marketing premises be transferred to a person who will offer a new franchise to the franchisee is simply that both the franchise and the interest in the premises come under the control of the new franchiser--here Tosco. An allotrope of that substance would be the rather traditional purchase with financing secured by the transferred property. The synthetic lease method used here is simply another allotrope. In short, the PMPA was complied with because the substance remained the same. Similarly, the substance of the PMPA was followed when Tosco offered the new franchises to the old Union Oil franchisees. Moreover, Union Oil did not violate the PMPA's timing provisions in any respect, and California law did not apply to this market withdrawal.
 
 
 62
 AFFIRMED.
 
 
 
 [1]
 This group appealed in No. 97-56324 and consists of EBRAHIM KAABIPOUR, dba, Sunnyvale Unocal & dba, Santa Clara Unocal; HASSAN KHAZIRI; HOSSAIN KHAZIRI; MOHSEN KHAZIRI; EVERGREEN UNION SERVICES, INC., dba Evergreen Unocal; FARIBORZ NICKBAKHSH-TALI, aka, Nick; ALI RAGHIAN, dba, Al's Unocal; THUY GIA NGUYEN; LEAVESLEY RD. UNION 76 INC.; NOAH TOLLISON; TOM W. BARNUM, dba, Cupertino Union; DAVID J. JOINES, dba, Unocal at North First and Brokaw; RONALD GENE DIEDRICH; dba, La Jolla Tire and Service Center; MARK HORNE; VU HADOUNG, dba, San Mateo Unocal; TINOOSH EFTEKHARIAN, dba, Sunnyside Unocal
 
 
 [2]
 This group appealed in No. 98-56216 and consists of CHARLES SIMMONS; LAWRENCE E. RAETHER; MEIR BEN-DAVID; SABOUR ANDKHOY; BASIR ANDKHOY; OMID BADAKHSH; AKBAR AKRAMI; SAYED HASHEMYAR; ATA TAJYAR, STEVEN TEDESCO; MANASSEH BAREH; DAVID AVISRUR; MEHRAN MIKE HARIRI; JAVAD S. TAAT; FARHAD PAKZAD; ALI MAJDI; ASGHAR KHOLDI; SEUNG K. CHOI; MANSOOR GHNEEIAN; YOSEF HOMAYUN; S.M.B. CORPORATION; A.H.B. PROPERTIES, INC.; SAGAHOH, INC.; WARM SPRINGS UNOCAL, INC.; DALLA, INC.; BEST CARE UNOCAL AUTO CENTER, INC.; CALABASAS UNOCAL, INC.; JOHN OTTE; TOROS DEURDULIAN; and KEVORK KASBARIAN
 
 
 [3]
 The Simmons Group also raised other claims which we have addressed in an unpublished memorandum disposition
 
 
 [4]
 This group appealed in No. 98-56631 and consists of CHARLES SIMMONS; LAWRENCE E. RAETHER; MEIR BEN-DAVID; SABOUR ANDKHOY; BASIR ANDKHOY; OMID BADAKHSH; AKBAR AKRAMI; SAYED HASHEMYAR; ATA TAJYAR, STEVEN TEDESCO; MANASSEH BAREH; DAVID AVISRUR; MEHRAN MIKE HARIRI; JAVAD S. TAAT; FARHAD PAKZAD; ALI MAJDI; ASGHAR KHOLDI; SEUNG K. CHOI; MANSOOR GHNEEIAN; YOSEF HOMAYUN; S.M.B. CORPORATION; A.H.B. PROPERTIES, INC.; SAGAHOH, INC.; WARM SPRINGS UNOCAL, INC.; DALLA, INC.; BEST CARE UNOCAL AUTO CENTER, INC.; CALABASAS UNOCAL, INC.; JOHN OTTE; GEORGE BENJAMIN. We have adopted the designation "Raether Group" to distinguish it from the Simmons Group, from which it differs only slightly. The careful reader will see that the caption for this case refers to Khaziri, but he is not part of the Raether Group
 
 
 [5]
 This group appealed in No. 98-56365 and consists of BASSAM D. HINDI; BEHROUZ SHIRDEL; MOHAMAD SHIRDEL; CARPINTERIA CAR CARE, INC.; CHI TAI; DANIEL LEE O'NEAL; DANIEL W. LENTZ; FAYE FOUAD; RAY FOUAD; FRANK E. JAKEL; GREGORY MESNA; GWENDOLYN MESNA; HARRY PERRY; HAYK BAZIK; HOVICK G. SADEGHI; JAVAD HAGHI (or HEIGH); JOHN OTTE; MAURO ANTENNCEI; ONNIK NICK MATHEVOSSIAN; PAUL A. HILLES; SAID SAIDATI; SALIM JAVAHIERI; TRACY FINNEL; VAN DUONG; BRADLEY DeBOER; EMRY BROTHERS INVESTMENTS, a general partnership; DENNIS AZZARELLO; VAHANEK KUPELIAN; M & K ENTERPRISES, INC., a California Corporation; STEPHEN NG; COUNTRY CLUB UNION, INC.; JOHN HIFAI; PATRICIA HILLES; SAEID SABOUR; TOMMY GENDAL
 
 
 [6]
 The term "franchise" includes "the contracts or agreements that provide for the franchisee's use of a franchisor's trademark, the lease of a service station, and the motor fuel supply contract." Han v. Mobil Oil Corp., 73 F.3d 872, 876 (9th Cir.1995); 15 U.S.C. § 2801(1). "The 'franchise relationship' is comprised of the respective obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise." Han, 73 F.3d at 876; 15 U.S.C. § 2801(2). The "franchise relationship" is "an entity separate from, but defined by, the 'franchise,' or contractual arrangement existing between the parties." Han, 73 F.3d at 876. The term "franchise relationship" reaches situations where the franchise contract may no longer exist. "The 'franchise relationship' term assures that the parties understand that even though the contract is no longer in effect, the PMPA still will protect a viable relationship between the parties." Id. at 876 n. 3
 
 
 [7]
 The PMPA defines "franchisor" as "a refiner or distributor ... who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel." 15 U.S.C. § 2801(3). A "franchise" is a contract "under which a refiner or distributor ... authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use." 15 U.S.C. § 2801(1)(A)
 
 
 [8]
 We refer, of course, to a transaction which is structured as the financing device often called a synthetic lease. See John C. Murray, Off-Balance-Sheet Financing: Synthetic Leases, 32 Real Prop. Prob. & Tr. J. 193, 195-200 (1997); Andrew Ratner, Synthetic Leasing: Too Good to be Ignored; Real Estate Financing, National Real Estate Investor, August 1996, at 104. While the arrangement is treated as an operating lease for accounting purposes under Generally Accepted Accounting Principles, a synthetic lease is viewed as a secured loan by the IRS for tax purposes. See Murray, supra at 196-97; Ratner, supra at 104; cf. Tech. Adv. Mem. 98-02-002 (Jan. 9, 1998); Rev. Proc. 75-21, 1975-1 C.B. 715; Rev. Proc. 75-28, 1975-1 C.B. 752; Rev. Proc. 76-30, 1976-2 C.B. 647. It is treated as a security instrument for both UCC and real property financing purposes. See William D. Egler, Financing Structures: A Primer of Synthetic Lease Transactions, Equipment Leasing, June 1997, at 5. And, in the area of bankruptcy, courts have also looked through other kinds of lease arrangements to the underlying "federal law purposes" and "economic realities" of those arrangements. See Moreggia & Sons, Inc. v. Walsh (In re Moreggia & Sons, Inc.), 852 F.2d 1179, 1182 (9th Cir.1988) (applying 11 U.S.C. § 365); see also Liona Corp. N.V. v. PCH Assocs. (In re PCH Assocs.), 804 F.2d 193, 201 (2d Cir.1986) (though transaction was labeled a sale and leaseback, its true nature was that of a joint venture and therefore no landlord-tenant relationship existed under § 365); In re Independence Village, 52 B.R. 715, 718-20 (Bankr.E.D.Mich.1985) (the intentions of the parties to the transaction and the economic substance of the transaction, rather than who holds legal title, determinative under § 365); see also Murray, supra at 204-208, 217-222 (bankruptcy issues discussed, treatment not entirely clear). There is no contention that the transaction here was not a synthetic lease. Of course, some care is needed in the use of the phrase, for it is the structure, not the phrase, that is important
 
 
 [9]
 The section reads:
 In the case of leased marketing premises as to which the franchisor owns a fee interest, the franchisor shall not sell, transfer, or assign to another person the franchisor's interest in the premises unless the franchisor has first either made a bona fide offer to sell, transfer, or assign to the franchisee the franchisor's interest in the premises, other than signs displaying the franchisor's insignia and any other trademarked, servicemarked, copyrighted or patented items of the franchisor, or if applicable, offered to the franchisee a right of first refusal of any bona fide offer acceptable to the franchisor made by another to purchase the franchisor's interest in the premises.
 
 
 [10]
 The court repeated this point in holding that the section was not an unconstitutional taking of the property right to sell a right of first refusal. The court held that "section 20999.25(a) substantially advances a legitimate state interest" because "[i]t facilitates the purchase of retail service stations by their independent lessee-franchisees in contexts outside franchise termination and nonrenewal, thereby ensuring the motoring public greater access to service stations and furthering a more dynamic and full-service oriented (tires, batteries, tune-ups, etc.) retailing atmosphere." Forty-Niner, 58 Cal.App.4th at 1273, 68 Cal.Rptr.2d at 538 (emphasis added)
 
 
 [11]
 Were it necessary to find a clash between § 20999.25 and the PMPA, we have little doubt that the terms of the PMPA must prevail when, as here, the franchises are being nonrenewed and terminated. See Pride, 911 F.2d at 258; Humboldt Oil, 823 F.2d at 374; In re Herbert, 806 F.2d at 892; see also Freightliner Corp. v. Myrick, 514 U.S. 280, 287, 115 S.Ct. 1483, 1487, 131 L.Ed.2d 385 (1995); Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). Again, however, we need not decide that question here