**CHEVRON U.S.A., INC., Plaintiff,**

v.

**James E. LUTZ, Defendant.**

**No. C01–3616 MHP.**

United States District Court,
N.D. California.

July 10, 2003.

---

Robert C. Phelps, Pillsbury Winthrop LLP, San Francisco, CA, for Plaintiff.

Peter L. Simon, Beyers Costin & Case, Santa Rosa, CA, for Defendant.

## MEMORANDUM AND ORDER

### re Defendant's Motion for Partial Summary Judgment

PATEL, Chief Judge.

Plaintiff Chevron U.S.A., Inc., ("Chevron") brought this action for termination of defendant James Lutz's franchise under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 et seq., on grounds that defendant James Lutz ("Lutz") failed to maintain records required by the franchise lease agreement and failed to comply with state and federal

**1198**

tax laws in violation of the lease agreement and the PMPA. Now before the court is defendant's motion for partial summary judgment on the issue of his intent to file incorrect tax returns. Having considered the arguments presented, and for the reasons set forth below, the court rules as follows.

## BACKGROUND

For the past 34 years, James Lutz has operated the Chevron station at 1440 East Washington Boulevard in Petaluma, California (the "service station") as a franchisee for Chevron. James Lutz Dec. ¶ 2. James Lutz's son, Dan Lutz, is employed as manager of the service station. Dan Lutz Dec. ¶ 2. Tim Lutz, James Lutz's eldest son, works as an certified public accountant for an accounting firm in San Jose, California. Tim Lutz Dec. ¶ 2. For the past twenty years, Tim Lutz has prepared tax returns for the service station as well as his father's personal tax returns. Tim Lutz Dec. ¶ 4.

Throughout the time he has run the service station, James Lutz has operated under written lease agreements with Chevron. James Lutz Dep. at 48:11–14. On April 6, 2001, Lutz entered into a three year lease of the station from Chevron consisting of a Dealer Lease ("lease agreement"), Dealer Supply contract and related agreements (collectively "dealer agreements"). Dealer Agreements, Snyder Dec., Exh. A; James Lutz Dep. at 74:19–17:14; Joint Statement of Undisputed Facts ("JUF") ¶ 3.

The previous lease agreement, signed in 1998, provided that Chevron would remodel the service station to add a convenience store and additional gasoline dispensers. JUF ¶ 12. The renovation took approximately four months and was completed on July 6, 1998. *Id.* ¶ 13. After the station reopened, Chevron allowed Lutz to operate at discounted rents until January 1, 1999. Rent Invoices, Toliver Dec., Exh B.

After January 1, 1999, Lutz was required to pay a rent based on a percentage of the greater of the fuel sold during that month or 125% of the fuel sold during the same calendar month the previous year. Reconstruction Agreement, Snyder Exh. C ¶ 7. Under this rent structure, the station became less profitable for the Lutz family. Dan Lutz Dep. at 63:23–64:25. In early 1999, Dan Lutz complained to Chevron about this rent structure and the resulting increase in monthly rent. Dan Lutz Dep. at 46:4–52:14.

The service station currently has two Electronic Point of Sale ("EPOS") cash registers. JUF ¶ 15. The EPOS registers transmit sales information at the service station to Chevron. JUF ¶ 16. Lutz also keeps a personal computer in an office at the service station which he uses to track sales. JUF ¶ 17. Lutz maintains that there has been a history of problems with the computer system since the installation of the EPOS terminals in approximately 1992. James Lutz Dec. ¶ 5; Dan Lutz Dec. ¶ 5. In particular, the Lutzes believe that computer has at times consistently generated inaccurate data for certain sales figures. James Lutz Dec. ¶ 5; Dan Lutz Dec. ¶ 5. For example, the computers might generate accurate figures for total gas sales, but inaccurate figures for total sales. The Lutzes stated that there has been confusion in the business over which of the computer-generated figures are trustworthy. James Lutz Dec. ¶ 5; Dan Lutz Dec. ¶ 5.

Lutz maintains that in 1999, he experienced some difficulties with the computer in their service station, after which Dan and Tim Lutz decided that the computer was calculating the total sales figure incorrectly, although the total sales tax figure remained reliable. Dan Lutz Dec. ¶ 6; Tim Lutz Dec. ¶¶ 8–9. In preparing the taxes for the service station, rather than

use the total sales figure which the computer generated, Tim Lutz calculated the total sales by dividing the total sales tax figure generated by the EPOS system by the sales tax rate. Tim Lutz Dec. ¶ 10.

On June 26, 2001, Everett Harry, an outside accountant retained by Chevron to conduct routine audits of several northern California service stations, visited the Service Station to review Lutz's records. Harry Dec. ¶¶ 2, 4. Harry examined records stored both at the Service Station and at Lutz's home, made copies of some of the records, and left Dan Lutz with a list of additional documents he required to complete the audit. *Id.* ¶ 5. Upon reviewing the records provided, Harry discovered that the Lutz's tax records indicated total sales of approximately half a million dollars less than the figure indicated by data reported to Chevron by the EPOS terminal over the years 1999 and 2000.[1] *Id.* ¶ 7. In discussing additional document requests with Dan and Tim Lutz in July 2001, Harry also notified both the brothers of the discrepancies his review had revealed. *Id.* ¶¶ 6, 9; JUF ¶ 8. Tim Lutz provided some supplemental information on July 15, 2001. *Id.* ¶ 10.

On August 9, 2001, Tim Lutz sent Harry two pages of prepared computer spreadsheets, uncorroborated by business records, with a note stating, "Hope this helps. The difference appears to be in nontaxable sales." *Id.* ¶ 13. Neither the unsupported spreadsheets nor other documents subsequently received from the Lutzes completely explained to Harry the discrepancies which he had discovered. *Id.* ¶¶ 13–15. Harry reported to Chevron that in the two-year period he had audited, the total sales reflected on Chevron EPOS invoices were $523,028 greater those shown on the

service station sales tax and income tax return. Harry Report to T.S. Toliver, Harry Dec., Exh A. Based on the contents of Harry's report, Chevron issued a Notice of Termination to Lutz on September 19, 2001. Toliver Dec. ¶ 10 & Exh A.

Shortly after the Chevron audit, Timothy Lutz filed amended 1999 tax returns for both the Lutz partnership and for James Lutz's personal income. Tim Lutz Dec. ¶ 17; 1999 Amended Return, Snyder Dec., Exh. I & J. He also corrected the 2000 returns which he had prepared at the time of the audit but not yet filed. Tim Lutz Dec. ¶ 17. No government agency has taken action against Lutz based on the handling of his 1999 income tax returns. James Lutz Dec. ¶ 18.

## LEGAL STANDARD

### I. Summary Judgment

Summary judgment shall be granted when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citations omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving

---

1. Chevron's records indicate that the Service Station gross sales totaled $8,335,204, in 1999 and $10,029,108 in 2000. Harry Report to Chevron Manager T.S. Toliver, Harry Dec.,

Exh A at 11. The discrepancies discovered by Harry fall short of Chevron's data by 2.4% in 1999 and by 3.2% in 2000.

party discharges its burden by showing that the nonmoving party has not disclosed the existence of any "significant probative evidence tending to support the complaint." *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). The court does not make credibility determinations in considering a motion for summary judgment. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

Questions involving a person's state of mind are generally factual issues inappropriate for resolution by summary judgment. *Braxton–Secret v. A. H. Robins Co.,* 769 F.2d 528, 531 (9th Cir.1985). Where the defendant's intent is at issue, summary judgment is appropriate only if all reasonable inferences defeat the plaintiff's claims. *White v. Roper,* 901 F.2d 1501, 1505 (9th Cir.1990). Even where the basic facts are undisputed, summary judgment should not be granted where competing inferences may reasonably be drawn from those facts. *Braxton–Secret,* 769 F.2d at 531. Where the dispute centers on the legal effect of undisputed facts, however, the matter may properly be decided on summary judgment. *Fonda v. Gray,* 707 F.2d 435, 438 (9th Cir.1983).

## II. *The PMPA*

The PMPA prohibits a franchisor of gasoline retail establishments from terminating a franchise agreement prior to the conclusion of the franchise term except in the circumstances set forth in 15 U.S.C. section 2802(b)(2). 15 U.S.C. § 2802(a). Among other grounds, section 2802(b)(2) allows termination of a franchise agreement when a franchisee breaches a provision of the franchise agreement which is "both reasonable and of material significance to the franchise relationship," 15 U.S.C. § 2802(b)(2)(A), or upon "the occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or non-renewal of the franchise relationship is reasonable." 15 U.S.C. § 2802(b)(2)(C).

Section 2802(c) sets forth a nonexhaustive list of occurrences which qualify as "events relevant to the franchise" upon which termination is "reasonable" under section 2802(b)(2)(C). Should an event listed in 2802(c) occur, the franchise may be terminated without further inquiry into whether the violation is serious enough to warrant termination. *Atlantic Richfield Co. v. Guerami,* 820 F.2d 280, 283 (9th Cir.1987). Included on that list and relevant to the present action are "fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises," 15 U.S.C. § 2802(c)(1), and "knowing failure of the franchisee to comply with Federal, State, or local laws or regulations relevant to the operation of the marketing premises," 15 U.S.C. § 2802(c)(11). The PMPA defines "failure" for purposes of the statute so as not to include "any failure which is only technical or unimportant to the franchise relationship." 15 U.S.C. § 2801(13)(A).

The Ninth Circuit has recognized that the chief purpose of the PMPA is to remedy the disparities in bargaining power between franchisees and franchisors in order to protect the franchisee's reasonable expectation of continuing the franchise relationship. *Unocal Corp. v. Kaabipour,* 177 F.3d 755, 762 (9th Cir.1999), *cert. denied,* 528 U.S. 1061, 120 S.Ct. 614, 145 L.Ed.2d 509 (1999). Where no competing interest presents itself, the statute should be construed liberally to protect the franchisees. *Id.* at 765.

## DISCUSSION

In his motion for summary judgment, Lutz argues that in order to terminate the franchise relationship based on Lutz's submission of incorrect tax returns, Chevron must prove that he knowingly filed false

tax returns. Lutz maintains that based on the evidence presented, no reasonable jury could find that he intended to submit incorrect tax returns, thereby failing to comply with state and federal law. Before turning to the evidence of Lutz's intent to file false tax returns, the court first addresses whether Chevron need prove intent to succeed in its action for termination.

## I. *Intent Showing Required for Termination*

■ Chevron maintains that defendant's filing of false income tax returns warrants termination as a violation of both the dealer agreement under section 2802(b)(2)(A) and as an event relevant to the franchise relationship under section 2802(b)(2)(C).[2] The provisions of the lease agreement that Chevron maintains were violated closely track the language of the relevant sections of 2802(c). Following the wording of section 2802(c)(1), the lease agreement provides for termination upon "[u]nlawful, fraudulent or deceptive acts or practices or criminal misconduct by Dealer relevant to the operation of the Premises ...." Lease Agreement, Snyder Dec., Exh. A ("Lease Agreement") ¶ 7(b)(8). For Lutz's understatement of income to qualify as fraudulent under these terms, he must have knowingly and intentionally misrepresented his true income. *See Bradford v. Comm'r of Internal Revenue,* 796 F.2d 303, 307 (9th Cir.1986) (defining fraud under 26 U.S.C. § 6653 as intentional wrongdoing with the specific intent to avoid a tax); Black's Law Dictionary 670 (7th ed.1999) (defining fraud as a "knowing misrepresentation of the truth or concealment of a material fact").

The lease agreement also provides for termination if the franchisee "knowingly fails to comply with Federal state or local laws or regulations relevant to the use or operation of the [station,]" Lease Agreement ¶ 7(b)(4). This term is in all material ways equivalent to subsection 2802(c)(11). The text of these provisions clearly states that a failure to comply with the law must be knowing in order to warrant termination.

Chevron also points to paragraph 2(c) of the lease agreement, which states that "Dealer shall ... (10) comply with all applicable Federal state and local laws and regulation relevant to the use or operation of the Premises ...." Lease Agreement ¶ 2(c)(10). This articulation of Lutz's obligations goes so far as to include unknowing and unintentional violations of the law.

Under the PMPA, however, violation of a contractual term of the lease agreement may only result in termination of the franchise where the provision violated is "reasonable and of material significance to the franchise relationship." 15 U.S.C. § 2802(b)(2)(A). Congress addressed violations of law as a grounds for franchise termination directly in section 2811(c)(11) and determined that only knowing violations would be "relevant to the franchise relationship" and a "reasonable" ground for termination. 15 U.S.C. §§ 2802(b)(2)(C), 2802(c). Allowing Chevron to expand the statutory grounds for termination simply by writing stricter terms into its contracts would frustrate the PMPA's purpose of protecting the franchisee from uneven bargaining power and would transform Congress's explicit judgments on the proper grounds for termi-

---

2. Chevron also claims that by failing to maintain records required by the Dealer Agreements, Lutz has failed to comply with provisions of the franchise agreement which are "both reasonable and of material significance to the franchise relationship," 15 U.S.C. § 2802(b)(2)(A). Compl. ¶¶ 17, 18, 27(a). Because the issue of intent on which Lutz seeks summary judgment does not arise in the allegation of insufficient record-keeping, the court does not address this statutory ground for termination in this order.

nation into a list of suggestions for fair franchise agreements. This the court declines to do. Insofar as paragraph 2(c)(10) of the contract conflicts directly with statutory grounds for termination set forth in section 2911(c)(11) by allowing termination based on unknowing and unintentional violations of the law, the court finds that the provision of the lease agreement is not "reasonable and of material significance to the franchise." An unknowing failure to comply with federal, state or local laws or regulations is not grounds for termination under the PMPA.

All of the provisions of the lease agreement and the PMPA under which Chevron claims termination is proper require that the franchisee engage in fraud or other knowing violation of the law. Chevron therefore must prove that Lutz knowingly understated his income on his 1999 tax returns in order to prevail in this action.

## II. *Imputation of Intent of Lutz's Sons to Lutz*

Lutz argues that Chevron cannot survive summary judgment on the grounds stated in the complaint by providing only evidence that Tim or Dan Lutz intended to file false tax returns, but must submit evidence to support a finding that James Lutz himself knowingly filed false tax re-

turns. Lutz rests this argument on the assertion that the provisions of the PMPA under which Chevron seeks termination require intent on the franchisee alone and do not contemplate vicarious intent. Chevron does not dispute that the text of both the lease and the PMPA call for termination only upon knowing misconduct by the dealer.[3] Rather, they argue that the intent may be imputed under agency law because James Lutz's sons are his agents with respect to the financial management of the service station.

■ Agency law provides that a principal may be held civilly liable under tort law or other civil causes of action for the fraud of an agent acting with apparent authority. *American Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 565, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). Where civil liability requires fraudulent intent, the fraudulent intent of the agent will suffice. *United States ex rel. Rosales v. San Francisco Housing Authority*, 173 F.Supp.2d 987, 1003 (N.D.Cal.2001) (Legge, J.). The present action, however, does not concern a tortious act or other form of civil liability, such as breach of contract. Chevron does not point to any cases in which a court has found a breach of contract rested solely on the agency relationship between one of the signatories and a third party.[4]

---

**3.** As discussed ante, both the Dealer Lease and the PMPA allows termination when the dealer, or franchisee, engages in fraud or knowingly fails to comply with federal, state or local law. Lease Agreement, Snyder Dec., Exh A ¶¶ 7(b)(4), 7(b)(8). The Dealer Lease designates the Dealer as James Lutz. *Id.* ¶ 1. In other provisions for termination in the Dealer Lease, the term "Dealer" is used to mean the individual signatory to the contract. For example, termination is warranted upon prolonged physical or mental disability of Dealer which prevents Dealer from providing for proper operation of the premises, *id.* ¶ (7)(b)(9); upon Dealer's conviction for a felony involving moral turpitude, *id.* ¶ (7)(b)(11); or in the event of Dealer's death, *id.*

¶ (7)(b)(12). The termination provisions of the PMPA employ the term franchisee, which is defined as a retailer or distributor. 15 U.S.C. § 2801(4). A retailer is in turn described as "any person" who purchases motor fuel for sale to the general public. 15 U.S.C. § 2801(7). The PMPA contains provisions similar to those in the lease for termination upon prolonged disability of the franchisee and conviction of the franchisee of a felony involving moral turpitude. 15 U.S.C. §§ 2802(c)(3), 2802(c)(12).

**4.** Chevron does cite *O'Shea v. Amoco Oil Co.*, CCH Bus. Franchise Guide ¶ 9152 (D.N.J. 1988), in which the court made reference to the agency relationship in finding that a deal-

California law provides that "a principal is responsible to third persons . . . for [his agent's] willful omission to fulfill the obligations of his principal." Cal. Civ.Code § 2338. Whether a particular obligation set forth in a contract may be breached by an agent of one of the signatories depends on the nature of contractual provision at issue. Accordingly, an examination of whether Lutz's sons can breach the relevant duties imposed under the contract must begin with the contract itself.

The provisions of both the lease agreement and the PMPA can be distinguished into two types: those that place requirements on the operation of the franchise and those that place personal requirements on the dealer. The former category includes such obligations as requiring the franchisee to pay its monthly rents, Lease Agreement ¶ 7(b)(3); 15 U.S.C. § 2802(c)(8), and to close the premises for no more than seven consecutive days, 15 U.S.C. § 2802(c)(9)(A). These terms do not refer to personal obligations of the dealer, but instead require the dealer to maintain certain standards for the operation of the business, presumably in order to maintain quality and uniformity. If these standards are not met, the dealer has failed his obligation under the lease agreement whether the dealer or his employees are directly responsible, unless the breach was beyond his "reasonable control." 15 U.S.C. § 2801(13)(B); *see also O'Shea v. Amoco Oil Co.*, CCH Bus. Franchise Guide ¶ 9152 (D.N.J.1988) (finding service station franchisee breached provision requiring twenty-four hour operation

even if station had closed due to "employee misconduct").

Both the lease agreement and the PMPA, however, also contain requirements which are undoubtedly personal to the franchisee, and which ensure that the dealer remains fit to carry out the franchise relationship. For example, termination is warranted if the dealer dies or becomes physically or mentally unable to provide for the continued operation of the station. Lease Agreement ¶¶ 7(b)(9), 7(b)(12); 15 U.S.C. § 2802(c)(3). Both the PMPA and the lease agreement also impose character requirements on dealers, Toliver Dec. ¶ 13, providing for termination if the dealer commits fraud or is convicted of a felony involving moral turpitude. Lease Agreement ¶¶ 7(b)(8), 7(b)(11); 15 U.S.C. §§ 2802(c)(1), 2802(c)(12). Allowing termination upon fraud or conviction of a felony involving moral turpitude recognizes that a "[g]ood faith belief of the franchisor that the franchisee is untrustworthy or engages in fraudulent practices undermines the entire franchise relationship." *See Humboldt Oil Co. v. Exxon, Co.*, 695 F.2d 386, 388–89 (9th Cir.1982).

■ An agent of the dealer cannot fail to fulfill those obligations which pertain to the dealer personally rather than the operation of the franchise. The independent fraudulent actions of a dealer's employee do not reflect directly on the dealer's integrity and trustworthiness, and therefore do not undermine the franchise relationship in the same manner as fraudulent acts by the dealer himself.[5] Employee miscon-

---

er breached a provision of his lease agreement requiring twenty-four hour operation, even if the station had closed due to "employee misconduct." The provision at issue in *O'Shea* did not govern only the actions of the dealer himself, but required simply that the station operate twenty-four hours per day. Even without invoking agency law, *O'Shea*

was in breach of this provision when the station closed regardless of who was responsible for the closure, unless the failure to abide by terms of the provision was "beyond the reasonable control of the franchisee." 15 U.S.C. § 2801(13)(B).

5. When a dealer supervises operation of the franchise so loosely as to allow employees to

duct about which the employer was unaware can be addressed through means less drastic than terminating the franchise, such as dismissal of the offending employee. Construing the provisions of the PMPA in favor of protecting franchisees from termination, the court finds that neither the contract nor the statute calls for termination simply because a dealer's employees have engaged in fraud or knowingly violated federal, state or local law. Accordingly, Chevron must show that James Lutz himself intentionally violated federal, state, or local law in order to warrant termination of the franchise.

## III. Evidence of Intent to File Incorrect Tax Returns

■ The court finally turns to evidence that James Lutz intended to violate federal and state income tax laws. Because direct evidence of fraudulent intent is rarely available, courts have recognized various types of circumstantial evidence which support a finding of intent to violate tax laws. *Bradford v. Comm'r of Internal Revenue*, 796 F.2d 303, 307 (9th Cir.1986). These badges of fraud include: (1) understatement of income, (2) inadequate records, (3) failure to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealing assets, and (6) failure to cooperate with tax authorities. *Id.* Chevron argues that the evidence shows that Lutz understated income by filing the false tax returns and kept insufficient records for the auditor to determine the service station's gross profit. Chevron also maintains that the explanations offered by Tim and Dan Lutz that they began calculating the gross sales from the sales tax because the computer generated figure for total sales was not accurate are implausible.

### A. Understatement of Income

As Chevron correctly states, the consistent and substantial understatement of income can itself constitute evidence of fraud. *Laurins v. Comm'r of Internal Revenue*, 889 F.2d 910, 913 (9th Cir.1989); *Ruark v. Comm'r of Internal Revenue*, 449 F.2d 311, 313 (9th Cir.1971) ("Gross understatement of income may in itself be a basis for a finding of fraud"). Courts have generally found an understatement of income to be itself evidence of fraud only where a sustained pattern of understatement exists over several years. *See Laurins v. Comm'r of Internal Revenue*, 889 F.2d 910 (9th Cir.1989) (upholding finding of fraud based on consistent underreporting of large sums over three years by a former tax litigation attorney); *Ruark* (upholding fraud finding where taxpayer had declared approximately 1% of her income over a four year period); *cf. Loftin & Woodard, Inc. v. United States*, 577 F.2d 1206 (5th Cir.1978) (noting that "two years in succession do not a pattern make.... The mere understatement of income, standing alone, is not enough [to prove fraud].").

The calculation technique employed by Tim Lutz caused significant understatement of income on the income tax returns for James Lutz and the Lutz partnership. On the returns for the partnership, Lutz initially understated the total sales and gross profit of the service station by more than $200,000. 1999 Partnership Return & 1999 Amended Partnership Return, Snyder Dec., Exh. I & J. This constituted an understatement of total sales by approximately 2–3%, but an understatement of gross profit by 23%. The calculation resulted in Lutz reporting only 54% of his

---

conduct business fraudulently without his knowledge, a franchisor may have grounds for termination on other grounds. Chevron has not presented this argument here, however-

er, but has advanced its claim for termination based only on the argument that any fraudulent intent on the part of Lutz's sons may be imputed to him.

actual taxable personal income—$142,495 rather than $262,713. 1999 Amended Personal Return, Snyder Dec., Exh. J. Although significant in its amount, this understatement of income occurred in a single year only. The following year, after the Chevron audit, Tim Lutz filed income tax returns that are not alleged to be inaccurate and also filed amended returns for the 1999 year. While the understatement of income might provide evidence of fraud when offered with other facts, it does not rise to the level of gross or sustained understatement which alone would support a finding of fraud.

Chevron also asserts that Lutz underpaid his state sales taxes. Lutz maintains that errors in calculating nontaxable sales resulted in him overpaying sales through the first quarter of 1999, and afterwards in him underpaying income tax while paying correct sales taxes. Lutz provides no evidence of this other than Tim Lutz's assertion that this occurred. Tim Lutz Dec. ¶ 7. However, Tim Lutz's assertions in his declaration as to how he calculated the sales tax payments for the second quarter of 1999 and afterwards, id. ¶ 10, directly contradict his own detailed deposition testimony as to how he performed the same calculation. Tim Lutz Dep. at 65:14–67:19. Tim Lutz's deposition testimony, supported by the monthly sales reports and tax worksheets, indicates that by subtracting nontaxable sales from an incorrect "gross sales" figure that actually included only taxable sales, Tim Lutz essentially deducted nontaxable sales twice. This resulted in him understating taxable sales by about 0.1% and therefore underpaying the state sales tax by a similar amount, or approximately $155 per quarter.[6] Id.; Second Quarter 1999 Sales Tax Return,

Snyder Dec., Exh. L. The court does not find this understatement significant enough to constitute fraud whether considered alone or together with the income tax return errors.

### B. Inadequate Records

Chevron asserts that the Lutzes have failed to keep adequate business records. The outside auditor, Everett Harry, indicates that at the time he made his report available, the Lutzes had still not provided business records which adequately explained discrepancies and had not turned over specific documents, such as annual financial statements. Harry Dec. ¶ 15; Harry Dec., Exh A. Chevron maintains that the Lutzes' records are inadequate because no business records (as opposed to accountant's spreadsheets) "explain" discrepancies between Chevron records and the reported income.

Chevron's allegations do not go to the adequacy of Lutz's records, but rather to the plausibility of Lutz's explanation. The Lutzes acknowledge that they miscalculated gross sales for a certain period. Chevron does not specify what further explanation is required to account for the discrepancies between figures. Chevron also fails to point to any piece of factual information regarding the finances of the service station which cannot be determined from the records presently available. Chevron has therefore failed to make a showing that service station kept inadequate records.

### C. Implausible or Inconsistent Explanations of Behavior

Chevron relies heavily on the implausibility of the Lutzes explanation for why

---

**6.** According to Chevron, Tim Lutz improperly deducted $2587 in nontaxable sales from the "total sales" figure of $2,300,333, even though the "total sales" figure actually constituted only taxable sales. Taxed at the prevailing rate of 6%, the tax on this amount is $155, or about 0.1% of the $137,779 that Lutz should have paid for the quarter. *See* Second Quarter 1999 Sales Tax Return, Snyder Dec., Exh. L.

Lutz understated his income on the 1999 returns. Chevron first notes the improbability that James Lutz, inexpert though he may be in the area of taxes, failed to notice that his personal income tax return listed his income as $142,495, only 54% of the correct figure of $262,713. 1999 Amended Personal Return, Snyder Dec., Exh. J. This argument simply amounts to a restatement of Chevron's position on the first indicia of fraud, that Lutz's understatement of income itself is so significant as to constitute evidence of intent to violate tax laws. As such, it does not gain additional weight by Chevron's reframing it to address a different factor in the test.

Chevron also points to several problems in the explanation of how the miscalculations of total sales could be an innocent mistake on the part of Tim and Dan Lutz, including: (1) Tim Lutz, an experienced CPA, made basic errors in calculating total sales; (2) the Lutzes asserted the computer was generating incorrect sales information while using the same system for years; (3) Tim Lutz changed from using computer generated total sales data to calculating total sales at the same time as the profitability of the station dropped; and (4) Tim Lutz's assertions that he properly calculated sales taxes beginning with the second quarter of 1999 is inconsistent with his deposition testimony and the worksheets for the sales tax calculation which suggest he underpaid the state sales tax.

While Lutz takes issue with the inferences drawn from the facts presented by Chevron, he does not undermine the factual basis for Chevron's argument nor present a persuasive reason why a jury could not draw the inference that his sons' explanation for the inaccuracies is implausible. The question before the court, however, is not the intent of Dan or Tim Lutz, but of James Lutz, the sole franchisee. Chevron

has offered no additional evidence suggesting implausibility to James Lutz's explanation that his sons mishandled the sales figures and that he did not notice the irregularities in the tax returns.

### D. Other Badges of Fraud

None of the other badges of fraud are present in this action. Far from failing to cooperate with the tax authorities, it is uncontested that Tim Lutz filed amended 1999 returns as soon as the error was discovered through the Chevron audit and corrected the 2000 returns before they were filed. Tim Lutz Dec. ¶ 17. Nor are there any allegations that James Lutz has ever failed to file tax returns or concealed assets, or that any other financial irregularities or allegations of wrongdoing arose during the thirty-four years he has maintained the dealership.

### E. Conclusion on Fraudulent Intent

■ The only evidence Chevron offers on fraudulent intent on the part of James Lutz is a single occasion in his thirty-four years of operating the service station on which he filed tax returns listing only about half of his actual personal income. Such an isolated understatement of income alone is insufficient to support a finding of fraudulent intent. *Loftin & Woodard*, 577 F.2d at 1239. From the facts before the court, no reasonable jury could infer that James Lutz intended to violate federal and state law by under-reporting income on his 1999 tax returns.

### CONCLUSION

For the foregoing reasons, the court GRANTS defendant's motion for partial summary judgment on the issue of intent.

IT IS SO ORDERED.